[L.A. No. 30398. Dec. 30, 1976.]

JOHN SERRANO, JR., et al., Plaintiffs and Respondents, v.
IVY BAKER PRIEST,* as State Treasurer, etc., et al.,
Defendants and Appellants;
CALIFORNIA FEDERATION OF TEACHERS, AFL-CIO,
Intervener and Respondent;
BEVERLY HILLS UNIFIED SCHOOL DISTRICT et al.,
Interveners and Appellants.

*Although neither the former state Treasurer (now deceased) nor the present holder of that office is a party to this appeal, we continue to use the title *Serrano* v. *Priest* for purposes of consistency and convenience.

**COUNSEL**

John H. Larson, County Counsel, James W. Briggs and Donovan M. Main, Deputy County Counsel, for Defendants and Appellants and for Interveners and Appellants.

Ronald A. Zumbrun, John H. Findley, H. LeRoy Cannon, Roger J. Nichols, Leonard Siegel and Nichols & Rose as Amici Curiae on behalf of Defendants and Appellants and Interveners and Appellants.

Sidney M. Wolinsky, Daniel M. Luevano, Rosalyn M. Chapman, John E. McDermott, Mary S. Burdick, Rose Ochi, Joel Edelman, David A. Binder, Harold W. Horowitz, Michael H. Shapiro, Jerome Levine and Robert F. Knox for Plaintiffs and Respondents.

Thomas M. Griffin, Stephen D. Sugarman, Robert H. Mnookin, John E. Coons, Ernest L. Aubry, John R. Phillips, Carlyle W. Hall, Jr., Brent N. Rushforth, Fredric P. Sutherland, A. Thomas Hunt and Timothy B. Flynn as Amici Curiae on behalf of Plaintiffs and Respondents.

Levy, Koszdin & Woods and Henry R. Fenton for Intervener and Respondent.

Kronick, Moskovitz, Tiedemann & Girard, Edward J. Tiedemann and Mark Paul as Amici Curiae.

## OPINION

**SULLIVAN, J.**—The instant proceeding, which involves a constitutional challenge to the California public school financing system, is before us for the second time. In 1971, we reversed a judgment of dismissal entered upon orders sustaining general demurrers and remanded the cause with directions that it proceed to trial. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241], hereafter cited as *Serrano I.*) In so doing we held that the facts alleged in plaintiffs' complaint were sufficient to constitute the three causes of action there set forth, and that if such allegations were sustained at trial, the state public school financing system must be declared invalid as in violation of state and federal constitutional provisions guaranteeing the equal protection of the laws.[1]

Upon remand answers to the complaint were filed by all existing defendants[2] and certain school districts of the County of Los Angeles were allowed to intervene as defendants, adopting as their own the answers previously filed by the other county defendants.[3] The California Federation of Teachers, AFL-CIO, was permitted to intervene as a plaintiff on condition that its complaint adopt the essential allegations of the original complaint. The trial court declined to accept defendants'

[1]The kernel of our holding was set forth as follows: "In sum, we find the allegations of plaintiffs' complaint legally sufficient and we return the cause to the trial court for further proceedings. We emphasize, that our decision is not a final judgment on the merits. We deem it appropriate to point out for the benefit of the trial court on remand (see Code Civ. Proc., § 43) that if, after further proceedings, that court should enter final judgment determining that the existing system of public school financing is unconstitutional and invalidating said system in whole or in part, it may properly provide for the enforcement of the judgment in such a way as to permit an orderly transition from an unconstitutional to a constitutional system of school financing. As in the cases of school desegregation (see *Brown* v. *Board of Education* (1955) 349 U.S. 294 [99 L.Ed. 1083, 75 S.Ct. 753]) and legislative reapportionment (see *Silver* v. *Brown* (1965) 63 Cal.2d 270, 281 [46 Cal.Rptr. 308, 405 P.2d 132]), a determination that an existing plan of governmental operation denies equal protection does not necessarily require invalidation of past acts undertaken pursuant to that plan or an immediate implementation of a constitutionally valid substitute. Obviously, any judgment invalidating the existing system of public school financing should make clear that the existing system is to remain operable until an appropriate new system, which is not violative of equal protection of the laws, can be put into effect." (*Serrano I,* at pp. 618-619.)

[2]The defendants at the time of the first appeal were the occupants of the state offices of Treasurer, Superintendent of Public Instruction, and Controller, and the Los Angeles County offices of tax collector, treasurer, and superintendent of schools.

[3]The intervening school districts were Burbank Unified, El Segundo Unified, Beverly Hills Unified, Long Beach Unified, San Marino Unified, Glendale Unified, and South Bay Union High School.

suggestion that the Legislature and the Governor be joined as indispensable parties.

Trial commenced on December 26, 1972. After more than 60 days of trial proceedings the court issued its "Memorandum Opinion Re Intended Decision" on April 10, 1974, and on August 30 of the same year filed its findings of fact and conclusions of law, there being 299 of the former and 128 of the latter. Judgment was entered on September 3, 1974, and defendants' motion for a new trial was denied on October 28, 1974. This appeal followed.[4]

I

Our decision in *Serrano I,* which due to the then legal posture of the proceeding directed itself only to the sufficiency of allegations of the complaint to state a cause of action and contemplated full trial proceedings for the proof of such allegations, nevertheless attracted the immediate attention of the California Legislature. As a result the lawmakers passed two bills—Senate Bill No. 90 (S.B. 90) and Assembly Bill No. 1267 (A.B. 1267)—which, upon becoming law during the pendency of trial proceedings, brought about certain significant changes in the public school financing system then under judicial scrutiny. Recognizing this, all parties to the action thereupon entered into a stipulation that for purposes of trial the California system for the financing of public schools should be deemed to include all law applicable at the time of trial. This agreement was later incorporated as follows among the trial court's conclusions of law: "For purposes of this litigation, the California system of financing public schools, includes not only all pertinent provisions of the California Constitution, statutes, and

[4]Two notices of appeal were filed in the trial court, one by the county defendants and the defendant-in-intervention school districts (see fn. 3, *ante*) and one by the then state Treasurer, Ivy Baker Priest. The remaining state defendants have not appealed. The appeals of the state Treasurer and defendants-in-intervention South Bay Union High School District and Glendale Unified School District were subsequently abandoned. Thus the only parties appellant are the county defendants and the remaining five intervening school districts.

With the permission of the court, briefs amicus curiae have been filed by defendant Wilson Riles, Superintendent of Public Instruction of the State of California; the Pacific Legal Foundation; San Francisco Unified School District; The Association of Concerned Teachers (ACT); The Childhood and Government Project (Earl Warren Legal Institute, Boalt Hall, University of Cal., Berkeley); The Education Finance & Governance Reform Project (Research Institute, Nairobi College, East Palo Alto); The California Taxpayers' Association; and the California School Finance Task Force (Graduate School of Public Policy, University of Cal., Berkeley). Jesse Unruh, the present state Treasurer, has also filed a brief.

administrative codes, and all pertinent provisions of federal statutes and regulations, but includes all modifications, amendments, and additions to the California statutes and administrative codes resulting from the California Legislature's enactment of those bills known as S.B. 90 and A.B. 1267." (See Stats. 1972, ch. 1406; Stats. 1973, ch. 208.)

In view of these developments we think it appropriate at this point, before undertaking a description of the particulars of the trial court's judgment, to review in some detail the specific nature of the changes in the financing system which were wrought by the Legislature following our decision.[5] Because our understanding of these changes depends in large part on an understanding of the system as it existed at the time of *Serrano I,* we begin by reiterating the description of that system, based on the allegations of the complaint and certain matters judicially noticed, which we set forth in our earlier opinion. Clarity of exposition dictates that the following excerpt be extensive.[6]

A. *The System Prior to S.B. 90 and A.B. 1267*

In *Serrano I,* we described the prior financing system as follows:

"We begin our task by examining the California public school financing system which is the focal point of the complaint's allegations. At the threshold we find a fundamental statistic—over 90 percent of our public school funds derive from two basic sources: (a) local district taxes on real property and (b) aid from the State School Fund.[7]

"By far the major source of school revenue is the local real property tax. Pursuant to article IX, section 6 of the California Constitution, the Legislature has authorized the governing body of each county, and city

---

[5]Following oral argument in this case the Legislature enacted and the Governor signed into law a school finance bill adding some $272 million to the state budget for these purposes. (Sen. Bill No. 1641, signed by the Governor on July 2, 1976.) This bill, of course, was not before the trial court, and we do not consider it today.

[6]For purposes of convenience we have renumbered the footnotes in the following excerpt from *Serrano I* in order to conform with the sequence of the instant opinion. Hereafter, unless otherwise indicated, all section references (including those in excerpts from *Serrano I*) are to the Education Code.

[7]California educational revenues for the fiscal year 1968-1969 came from the following sources: local property taxes, 55.7 percent; state aid, 35.5 percent; federal funds, 6.1 percent; miscellaneous sources, 2.7 percent. (Legislative Analyst, Public School Finance, Part I, Expenditures for Education (1970) p. 5. Hereafter referred to as Legislative Analyst.)

and county, to levy taxes on the real property within a school district at a rate necessary to meet the district's annual education budget. (Ed. Code, § 20701 et seq.) The amount of revenue which a district can raise in this manner thus depends largely on its tax base—i.e., the assessed valuation of real property within its borders. Tax bases vary widely throughout the state; in 1969-1970, for example, the assessed valuation per unit of average daily attendance of elementary school children[8] ranged from a low of $103 to a peak of $952,156—a ratio of nearly 1 to 10,000. (Legislative Analyst, Public School Finance, Part V, Current Issues in Educational Finance (1971) p. 7.)[9]

"The other factor determining local school revenue is the rate of taxation within the district. Although the Legislature has placed ceilings on permissible district tax rates (§ 20751 et seq.), these statutory maxima may be surpassed in a 'tax override' election if a majority of the district's voters approve a higher rate. (§ 20803 et seq.) Nearly all districts have voted to override the statutory limits. Thus the locally raised funds which constitute the largest portion of school revenue are primarily a function of the value of the realty within a particular school district, coupled with the willingness of the district's residents to tax themselves for education.

"Most of the remaining school revenue comes from the State School Fund pursuant to the 'foundation program,' through which the state undertakes to supplement local taxes in order to provide a 'minimum amount of guaranteed support to all districts . . . .' (§ 17300.) With certain minor exceptions,[10] the foundation program ensures that each school

---

[8]Most school aid determinations are based not on total enrollment, but on 'average daily attendance' (ADA), a figure computed by adding together the number of students actually present on each school day and dividing that total by the number of days school was taught. (§§ 11252, 11301, 11401.) In practice, ADA approximates 98 percent of total enrollment. (Legislative Analyst, Public School Finance, Part IV, Glossary of Terms Most Often Used in School Finance (1971) p. 2.) When we refer herein to figures on a 'per pupil' or 'per child' basis, we mean per unit of ADA.

[9]Over the period November 1970 to January 1971 the legislative analyst provided to the Legislature a series of five reports which 'deal with the current system of public school finance from kindergarten through the community college and are designed to provide a working knowledge of the system of school finance.' (Legislative Analyst, Part I, supra, p. 1.) The series is as follows: Part I, Expenditures for Education; Part II, The State School Fund: Its Derivation and Distribution; Part III, The Foundation Program; Part IV, Glossary of Terms Most Often Used in School Finance; Part V, Current Issues in Educational Finance.

[10]Districts which maintain 'unnecessary small schools' receive $10 per pupil less in foundation funds. (§ 17655.5 et seq.)

Certain types of school districts are eligible for 'bonus' foundation funds. Elementary districts receive an additional $30 for each student in grades 1 through 3; this sum is

district will receive annually, from state or local funds, $355 for each elementary school pupil (§§ 17656, 17660) and $488 for each high school student. (§ 17665.)

"The state contribution is supplied in two principal forms. 'Basic state aid' consists of a flat grant to each district of $125 per pupil per year, regardless of the relative wealth of the district. (Cal. Const., art. IX, § 6, par. 4; Ed. Code, §§ 17751, 17801.) 'Equalization aid' is distributed in inverse proportion to the wealth of the district.

"To compute the amount of equalization aid to which a district is entitled, the State Superintendent of Public Instruction first determines how much local property tax revenue would be generated if the district were to levy a hypothetical tax at a rate of $1 on each $100 of assessed valuation in elementary school districts and $.80 per $100 in high school districts.[11] (§ 17702.) To that figure, he adds the $125 per pupil basic aid grant. If the sum of those two amounts is less than the foundation program minimum for that district, the state contributes the difference. (§§ 17901, 17902.) Thus, equalization funds guarantee to the poorer districts a basic minimum revenue, while wealthier districts are ineligible for such assistance.

"An additional state program of 'supplemental aid' is available to subsidize particularly poor school districts which are willing to make an extra local tax effort. An elementary district with an assessed valuation of $12,500 or less per pupil may obtain up to $125 more for each child if it sets its local tax rate above a certain statutory level. A high school district whose assessed valuation does not exceed $24,500 per pupil is eligible for a supplement of up to $72 per child if its local tax is sufficiently high. (§§ 17920-17926.)[12]

---

intended to reduce class size in those grades. (§ 17674.) Unified school districts get an extra $20 per child in foundation support. (§§ 17671-17673.)

[11]This is simply a 'computational' tax rate used to measure the relative wealth of the district for equalization purposes. It bears no relation to the tax rate actually set by the district in levying local real property taxes.

[12]Some further equalizing effect occurs through a special areawide foundation program in districts included in reorganization plans which were disapproved at an election. (§ 17680 et seq.) Under this program, the assessed valuation of all the individual districts in an area is pooled, and an actual tax is levied at a rate of $1 per $100 for elementary districts and $.80 for high school districts. The resulting revenue is distributed among the individual districts according to the ratio of each district's foundation level to the areawide total. Thus, poor districts effectively share in the higher tax bases of their wealthier neighbors. However, any district is still free to tax itself at a rate higher than $1 or $.80; such additional revenue is retained entirely by the taxing district.

"Although equalization aid and supplemental aid temper the disparities which result from the vast variations in real property assessed valuation, wide differentials remain in the revenue available to individual districts and, consequently, in the level of educational expenditures.[13] For example, in Los Angeles County, where plaintiff children attend school, the Baldwin Park Unified School District expended only $577.49 to educate each of its pupils in 1968-1969; during the same year the Pasadena Unified School District spent $840.19 on every student; and the Beverly Hills Unified School District paid out $1,231.72 per child. (Cal. Dept. of Ed., Cal. Public Schools, Selected Statistics 1968-1969 (1970) Table IV-11, pp. 90-91.) The source of these disparities is unmistakable: in Baldwin Park the assessed valuation per child totaled only $3,706; in Pasadena, assessed valuation was $13,706; while in Beverly Hills, the corresponding figure was $50,885—a ratio of 1 to 4 to 13. (*Id.*) Thus, the state grants are inadequate to offset the inequalities inherent in a financing system based on widely varying local tax bases.

"Furthermore, basic aid, which constitutes about half of the state educational funds (Legislative Analyst, Public School Finance, Part II, The State School Fund: Its Derivation, Distribution and Apportionment (1970) p. 9), actually widens the gap between rich and poor districts. (See Cal. Senate Fact Finding Committee on Revenue and Taxation, State and Local Fiscal Relationships in Public Education in California (1965) p. 19.) Such aid is distributed on a uniform per pupil basis to all districts,

---

[13]Statistics compiled by the legislative analyst show the following range of assessed valuations per pupil for the 1969-1970 school year:

| | Elementary | High School |
|---|---|---|
| Low | $ 103 | $ 11,959 |
| Median | 19,600 | 41,300 |
| High | 952,156 | 349,093 |

(Legislative Analyst, Part V, *supra,* p. 7.)
 "Per pupil expenditures during that year also varied widely:

| | Elementary | High School | Unified |
|---|---|---|---|
| Low | $ 407 | $ 722 | $ 612 |
| Median | 672 | 898 | 766 |
| High | 2,586 | 1,767 | 2,414 |

(*Id.,* at p. 8.)
 "Similar spending disparities have been noted throughout the country, particularly when suburban communities and urban ghettos are compared. (See, e.g., Report of the National Advisory Commission on Civil Disorders (Bantam ed. 1968) pp. 434-436; U.S. Commission on Civil Rights, Racial Isolation in the Public Schools (1967) pp. 25-31; Conant, Slums and Suburbs (1961) pp. 2-3; Levi, *The University, The Professions, and the Law* (1968) 56 Cal.L.Rev. 251, 258-259.)

irrespective of a district's wealth. Beverly Hills, as well as Baldwin Park, receives $125 from the state for each of its students.

"For Baldwin Park the basic grant is essentially meaningless. Under the foundation program the state must make up the difference between $355 per elementary child and $47.91, the amount of revenue per child which Baldwin Park could raise by levying a tax of $1 per $100 of assessed valuation. Although under present law, that difference is composed partly of basic aid and partly of equalization aid, if the basic aid grant did not exist, the district would still receive the same amount of state aid—all in equalizing funds.

"For Beverly Hills, however, the $125 flat grant has real financial significance. Since a tax rate of $1 per $100 there would produce $870 per elementary student, Beverly Hills is far too rich to qualify for equalizing aid. Nevertheless, it still receives $125 per child from the state, thus enlarging the economic chasm between it and Baldwin Park. (See Coons, Clune & Sugarman, *Educational Opportunity: A Workable Constitutional Test of State Financial Structures* (1969) 57 Cal.L.Rev. 305, 315.)" (*Serrano I,* at pp. 591-595.)

It was the above-described system, then, which concerned us in *Serrano I.* If, we held, the allegations of the complaint upon trial were found to be true, thus establishing that the system described was the one actually existing in California, that system would be invalid as in violation of state and federal equal protection provisions. The Legislature, apparently recognizing the likelihood of such a finding, decided not to await the outcome of such proceedings but to address itself immediately to the problem. (For an early comment on the practical economics confronting the Legislature in its response to *Serrano I* see Post & Brandsma, *The Legislature's Response to Serrano v. Priest,* 4 Pacific L.J. 28.) It is to the changes resulting from these legislative efforts that we now proceed to direct our comments.

B. *The New System*

The changes brought about by the passage of S.B. 90 and A.B. 1267, while significant, did not purport to alter the basic concept underlying the California public school financing system. That concept, which we may refer to as the "foundation approach," undertakes in general to insure a certain guaranteed dollar amount for the education of each child in each school district, and to defer to the individual school district for

the provision of whatever additional funds it deems necessary to the furtherance of its particular educational goals. As indicated in the foregoing excerpt, the mechanisms by which this concept was implemented prior to the adoption of S.B. 90 and A.B. 1267 were basically four: (1) basic aid, (2) equalization aid, (3) supplemental aid, and (4) tax rate limitations and overrides. The new law retained three of these, the element of supplemental aid (see text accompanying fn. 12, *ante*) being discontinued. The basic aid component remained the same, i.e., $125 per ADA. Thus it was fundamentally through adjustments and alterations in the remaining two areas—equalization aid and tax rate limitations and overrides—that the Legislature sought to bring the system into constitutional conformity.[14]

Perhaps the most dramatic aspect of the new law was a substantial increase in the foundation level. For the fiscal year 1973-1974 this figure, which constitutes the minimum amount per pupil guaranteed to each district by the state, was in general raised for elementary school districts from the previous level of $355 per ADA to the sum of $765 per ADA, and for high school districts from $488 to $950 per ADA. (§§ 17656, 17665.) Corresponding increases were provided for small schools (see fn. 10, *ante*), and areawide foundation programs (fn. 12, *ante*) were retained. Provision was also made to offset the so-called "slippage factor," which has been the result of yearly increases in the assessed valuation of real property within the districts (leading to an increase in the amount of local contribution through application of the "computational tax rate" (fn. 11, *ante*) and a corresponding decrease in state contribution). Thus, a yearly increase in the foundation level of approximately 7 percent for the first three years and 6 percent thereafter was prescribed. (§ 17301, former subd. (e); see present § 17669.) At the same time, however, the "computational tax rate" was raised from $1 to $2.23 at the elementary level and from $0.80 to $1.64 at the high school level. (§ 17702.)

The second major aspect of the new program involved the creation of "revenue limits," or limitations on maximum expenditures per pupil in

---

[14]Although the following text confines itself to a description of the basic operational features of the new law from the standpoint of the ongoing foundational approach on which it is based, it is appropriate to note at this point that S.B. 90 and A.B. 1267 also introduced certain modifications of a categorical nature. The most important of these was the establishment of the Educationally Disadvantaged Youth Programs (§ 6499.230 et seq.) and of the Early Childhood Education Programs (§ 6445 et seq.). The former program authorized $82 million in state assistance, to be awarded on a project basis to districts with a heavy incidence of family poverty, bilingualism, and pupil transiency, while the latter authorized $25 million for 1973-1974 and $40 million for 1974-1975 also on a project basis, to restructure primary education in grades K through 3.

each school district exclusive of state and federal categorical support and of revenue generated by permissive override taxes. (§ 20902 et seq.) These provisions, generally speaking, allowed a district without a voted override to levy taxes at a rate no higher than would increase its expenditures per pupil over 1972-1973 base revenues by a permitted yearly inflation factor.[15] A district having a school tax rate which produced revenues in excess of foundation levels would receive inflation adjustments which decreased in magnitude as those revenues rose above foundation levels. On the other hand, a district having base revenues which, when added to the full inflation allowance, did not reach the foundation level, could increase its revenues by up to 16 percent of the preceding year's revenue limit per ADA.

The combination of the foregoing rate limitation structure and the ever-advancing foundation levels would, it was contemplated, produce a phenomenon known as "convergence." While poorer districts could move with comparative rapidity toward the rising foundation levels, richer districts, due to the diminished inflation adjustment permitted them, would increase their revenue bases at a much slower rate.[16] This prognosis was complicated, however, by the fact that district revenue limits applied only to revenue generated by the maximum general purpose tax rate available to a district in the absence of voter approval. Such limitations might be exceeded as before (see text following fn. 9, *ante*) if a majority of the voters in the district voted an override (§ 20906). Permissive overrides (i.e., overrides which can be imposed without voter

---

[15]For the year 1973-1974, several alternatives were provided for determining the allowable increase in expenditures:

(a) A district may add to the 1972-1973 revenue base per pupil a flat $70 inflation allowance, or a percentage thereof, or a district below the foundation program may instead move toward the foundation program at a maximum of 116 percent; or

(b) A district may add the unused portion of a voted override tax rate to the revenue limit computational tax rates, and use a $65 inflation allowance per pupil, or a percentage thereof, or a district below the foundation program may instead move toward the foundation program at a maximum of 115 percent; or

(c) A district may add to the 1972-1973 revenue base the unrestricted balances used to balance income to expenditures in 1972-1973, but not to exceed 3 percent of the total expenditures in certain expenditures classifications of the state's general fund for 1972-1973, and use the $65 inflation allowance per pupil, or a percentage thereof, or a district below the foundation program may instead move toward the foundation program at a maximum of 115 percent.

[16]The result of this process in many of the richer districts (barring tax rate overrides, to be discussed below) will be a reduction in the general purpose tax rate: To the extent that annual growth in assessed valuation in such districts increases the amount of revenue to be obtained under the existing tax rate to a sum in excess of the prior year's revenue limit plus the permitted inflation adjustment, the rate will have to be lowered.

approval) were also authorized to raise revenue for certain special purposes, such as capital outlay.

## II

With this background in mind we turn to a consideration of the trial court's findings and judgment.

As indicated above, the trial court issued voluminous and comprehensive findings in support of its judgment. While we do not here undertake to present a complete summary of those findings, especially as they duplicate what has been pointed out above, it is important for present purposes to indicate their substance as they relate to the effect and validity of the system as it now stands following the legislative alterations enacted after our decision in *Serrano I*.

### A. *Findings of Fact*

The court found in substance as follows:

The California public school financing system following the adoption of. S.B. 90 and A.B. 1267 continues to be based upon the foundation concept. Although there have been substantial increases in foundation levels, those increases, considered alone, do not eliminate any of the unconstitutional features which existed at the time of *Serrano I*. The retention of the basic-aid element in the foundation program, for example, continues to have an anti-equalizing effect by benefitting only those districts not eligible for equalization aid. Moreover, basic-aid districts continue to be favored over equalization-aid districts insofar as they may reach the foundation level with a tax rate less than the computational rate or by using the comptational rate raise revenue in excess of the foundation level.

The revenue limit feature of the new law has similarly serious defects. By taking 1972-1973 revenues as its base figure, it perpetuates inequities resulting from property tax base differentials. More importantly, it will allow total "convergence" between high-spending revenue limits and rising foundation levels only after many, perhaps as many as 20, years—*even assuming no voted overrides*. After five years of functioning —again assuming that no voted overrides occur, many high-wealth, high-spending districts will still be spending two to three times more per pupil than many low-wealth districts are able to spend. Even when the

"convergence" has run its course, there will continue to be a substantial inequality between basic-aid and equalization-aid districts, again assuming no voted overrides, due to the fact that the former districts will be able to achieve the foundation level at a tax rate which is less than the computational rate. Thus, to the extent that equal tax rates can produce differing expenditure levels, or that equal expenditure levels can be produced by differing tax rates, the system will continue to generate school revenue in proportion to the wealth of the individual district.[17]

This potential disparity is exacerbated by the continued availability of voted overrides pursuant to section 20906. The passage of such overrides by high-wealth school districts would operate to nullify the contemplated "convergence" effect sought to be achieved by increased equalization aid and the imposition of revenue limits. The operation of the latter feature, in combination with continuing inflation, will make it impossible for high-wealth, high-spending districts to maintain the present quality of their programs, and therefore such districts will have a great incentive to vote tax rate overrides because even a slight rate increase in such districts will raise substantial revenues. In the districts having a relatively low assessed valuation per pupil, on the other hand, the incentive to vote such overrides will be less, for only a substantial increase in the tax rate will be sufficient to produce substantial additional revenues. As a result, the extent of local control (i.e., "the opportunity to go above the foundation program level in pursuit of a higher quality program") will continue to be a function of district wealth under the new law.

[17]To illustrate, assume for a given district a $1,000 per ADA foundation level and a $3 per $100 computational tax rate. Assume further that one district has an assessed valuation of $50,000 per ADA while another has an assessed valuation of one-third that, or $16,667. In the first district the application of the computational tax rate will produce $1,500 per ADA, while in the second it will produce only $500 per ADA. The first district would not be entitled to equalization aid but would still receive the $125 per ADA basic aid payment. The second district would be entitled to equalization aid in the amount of $375 per ADA—i.e., the figure by which the sum of the amount available under the computational rate ($500 per ADA) and the basic aid payment ($125 per ADA) is exceeded by the foundation level ($1,000 per ADA), but in order to spend at the foundation level it would have to tax at the computational rate. If it wished to exceed the foundation level, it would be required to tax at a rate (up to the allowable limit) in excess of that rate.

The richer district, on the other hand, would be able to maintain the foundation level of expenditure by taxing at a mere $1.75 rate (i.e., that percent of $50,000 which when added to the basic aid allowance yields $1,000 per ADA). If applicable revenue limits allowed it to tax at the full computational rate (i.e., that rate at which the poorer district would be required to tax merely in order to achieve the foundation level) it would have the sum of $1,625 per ADA ($1,500 per ADA plus the basic aid payment of $125 per ADA)—or 1⅗ the amount available to the poorer district—at its disposal.

[This example, although not explicitly contained in the findings of the trial court, is based upon them.]

The effect of disparities in district wealth also continues to be felt in the area of capital outlay. Permissive override taxes for this purpose, authorized by the new law for the repayment of bonded indebtedness and state aid loans, generate more revenue at a given tax rate in districts with a high assessed valuation per pupil than in districts with lower assessed valuation per pupil. Moreover, wealthier districts, being generally able to generate sufficient funds for capital outlay purposes within their bonding capacities, are often not required to levy permissive override taxes for the repayment of state aid loans, which is the only source of assistance for districts whose bonding capacity is insufficient to finance needed capital improvements.

Municipal tax overburden, which "refers to high property tax rates for other governmental services than education," is a phenomenon of low-wealth, low-spending districts as well as high-wealth, high-spending districts. The problems associated with this phenomenon—such as vandalism, bilingualism, old buildings, disadvantaged youth, and poverty —are present in all such districts, but the wealthier districts from the point of view of assessed valuation per pupil are better able to respond to such problems than the poorer districts.

Similarly, the presence of small districts, which require greater expenditures because of "diseconomies of scale," is not confined to wealthier districts, and wealth differences among such districts create substantial disparities in both tax rates and expenditures.

While federal revenue grants to school districts in which federal tax-exempt facilities are located must be considered in evaluating wide disparities in assessed wealth per pupil, the availability of such revenue under Public Law 81-874 has been substantially curtailed, accounts for only a negligible amount of total educational revenue in California, and affects only a small number of districts. Even among such districts wide variations in assessed wealth create inequity in tax rates and spending levels.

In view of all of the foregoing it is clear that substantial disparities in expenditures per pupil resulting from differences in local taxable wealth will continue to exist under S.B. 90 and A.B. 1267. The reason for this is that essentially local wealth is the principal determinant of revenue, that high wealth districts do not need to make the same tax effort as low wealth districts in order to reach, let alone exceed, the level of the

foundation program and that in this setting, basic aid becomes anti-equalizing and "convergence" of doubtful achievement.[18]

There exist several alternative potential methods of financing the public school system of this state which would not produce wealth-related spending disparities. These alternative methods, which are "workable, practical and feasible," include: "(1) full state funding, with the imposition of a statewide property tax; (2) consolidation of the present 1,067 school districts into about five hundred districts, with boundary realignments to equalize assessed valuations of real property among all school districts; (3) retention of the present school district boundaries but the removal of commercial and industrial property from local taxation for school purposes and taxation of such property at the state level; (4) school district power equalizing[,] which has as its essential ingredient the concept that school districts could choose to spend at different levels but for each level of expenditure chosen the tax effort would be the same for each school district choosing such level whether it be a high-wealth or a low-wealth district; (5) vouchers; and (6) some combination of two or more of the above."

Substantial disparities in expenditures per pupil among school districts cause and perpetuate substantial disparities in the quality and extent of availability of educational opportunities. For this reason the school financing system before the court fails to provide equality of treatment to all the pupils in the state. Although an equal expenditure level per pupil in every district is not educationally sound or desirable because of differing educational needs, equality of educational opportunity requires

[18]The court found that: "Substantial disparities in expenditures per pupil from district to district that are the result of differences in local taxable wealth will continue to exist under S.B. 90 and A.B. 1267 in that:

"(a) High-wealth, basic-aid districts do not make the same tax effort to reach the foundation program as do low-wealth, equalization-aid districts.

"(b) Above the foundation program, local wealth is the primary determinant of the amount of revenue generated for a given tax rate.

"(c) The amount of revenue from permissive override taxes is solely determined by the amount of wealth available to a school district.

"(d) The amount of revenue from voted override taxes is solely determined by the amount of wealth within a particular school district.

"(e) Low-wealth districts are denied an equal opportunity to exceed the foundation program by utilizing voted overrides under Section 20906.

"(f) Revenue from local permissive taxes to repay local bonded indebtedness depends upon local wealth.

"(g) Basic aid is anti-equalizing, actually widening the gap between low-wealth and high-wealth districts.

"(h) Convergence of revenue limits with the foundation program occurs slowly, and may never occur as a result of the voted override provision."

that all school districts possess an equal ability in terms of revenue to provide students with substantially equal opportunities for learning. The system before the court fails in this respect, for it gives high-wealth districts a substantial advantage in obtaining higher quality staff, program expansion and variety, beneficial teacher-pupil ratios and class sizes, modern equipment and materials, and high-quality buildings.

There is a distinct relationship between cost and the quality of educational opportunities afforded. Quality cannot be defined wholly in terms of performance on statewide achievement tests because such tests do not measure all the benefits and detriments that a child may receive from his educational experience. However, even using pupil output as a measure of the quality of a district's educational program, differences in dollars do produce differences in pupil achievement.

## B. *Conclusions of Law and Judgment*

Although we consider it unnecessary to set out a comprehensive review of the trial court's 128 conclusions of law, the most fundamental of those conclusions were incorporated into the judgment, which we now describe.

The trial court held that the California public school financing system for elementary and secondary schools as it stood following the adoption of S.B. 90 and A.B. 1267, while not in violation of the equal protection clause of the Fourteenth Amendment to the federal Constitution,[19] was invalid as in violation of former article I, sections 11 and 21, of the California Constitution (now art. IV, § 16 and art. I, § 7 respectively; see and compare *Serrano I, supra,* at p. 596, fn. 11), our state equal

---

[19]This conclusion was based on the decision of the United States Supreme Court in *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278], wherein the high court—in a decision subsequent to *Serrano I*—held that the Texas public school financing system, which like the California system is based on the foundational concept, was not in violation of the federal equal protection provision. In so concluding, a majority of the high court held inter alia that education was not a "fundamental interest" entitled to strict scrutiny under the federal provision because the right to education was not explicitly or implicitly guaranteed by the terms of the Constitution. (*Id.* at pp. 33-34, 60-62 [36 L.Ed.2d at pp. 43, 44, 58-60].) Proceeding to examine the Texas system under the less stringent standard applicable to cases not demanding strict scrutiny, the majority went on to conclude that the system in question rationally furthered the legitimate state purpose or interest in local control of education. (*Id.* at pp. 44-55, 62 [36 L.Ed.2d at pp. 49-56, 59, 60].)

protection provisions.[20] Indicating the respects in which the system before it was violative of our state constitutional standard,[21] the court set a period of six years from the date of entry of judgment[22] as a reasonable time for bringing the system into constitutional compliance; it further held and ordered that the existing system should continue to operate until such compliance had been achieved. The judgment specifically

[20]The trial court, using by analogy the *Rodriguez* majority's standard for the determination of whether the interest affected by the classification in question was "fundamental" (thus requiring strict scrutiny review), concluded that the interest of children in education was explicitly and implicitly protected and guaranteed by the terms of the *California* Constitution. Applying the strict scrutiny test, it concluded that the California system was not necessary to the accomplishment of any compelling state interest and was therefore invalid.

The court further held that "[t]he school financing system for the State of California violates the equal-protection provisions of the California Constitution even under the lesser constitutional standard of rational relationship."

[21]The indicated portions of the judgment provided:

"3. That the following features of said California Public School Financing System, including the SB 90 and AB 1267 legislation pertaining thereto, are violative of said equal-protection-of-the-laws provisions of the California Constitution:

"(a) The basic aid payments of $125.00 per pupil to high-wealth school districts.

"(b) The right of voters of each school district to vote tax overrides and raise unlimited revenues at their discretion.

"(c) Wealth-related disparities between school districts in per-pupil expenditures, apart from the categorical aids special needs programs, that are not designed to, and will not reduce to insignificant differences, which mean amounts considerably less than $100.00 per pupil, within a maximum period of six years from the date of entry of this Judgment.

"(d) Wealth-related variations in tax rates between school districts that are not designed to, and will not reduce to nonsubstantial variations within the same maximum six-year period set forth in subparagraph (c) above for the equalization of per-pupil expenditure levels.

"4. That wealth-related, per-pupil expenditure disparities between school districts which are violative of said equal-protection-of-the-laws provisions of the California Constitution include, but are not limited to, the following:

"(a) High-wealth, basic-aid school districts do not make the same tax effort to reach the foundation-program levels as do low-wealth, equalization-aid school districts.

"(b) Above the foundation-program levels, local property wealth is the primary determinant of the amount of revenue generated for a given tax rate.

"(c) The amount of revenue derived from override taxes is determined solely by the amount of taxable property wealth within a particular school district.

"(d) Low-wealth school districts are denied an equal opportunity to exceed the foundation-program levels by utilizing voted overrides under Section 20906 of the Education Code.

"(e) The amount of revenue derived from permissive override taxes is determined solely by the amount of taxable property wealth within a particular school district.

"(f) Unused voted tax overrides are used to determine maximum school district revenue limits under the SB 90 and AB 1267 legislation."

[22]The trial court had found as a fact that "Present disparities in expenditures per pupil among districts that are the result of differences in local district taxable wealth can be efficiently and effectively eliminated within six years."

provided that it was not to be construed to require the adoption of any particular system of school finance, but only to require that the plan adopted comport with the requirements of state equal protection provisions. Finally, the trial court retained jurisdiction of the action and over the parties "so that any of such parties may apply for appropriate relief in the event that relevant circumstances develop, such as a failure by the legislative and executive branches of the state government to take the necessary steps to design, enact into law, and place into operation, within a reasonable time from the date of entry of this Judgment, a California Public School Financing System for public elementary and secondary schools that will fully comply with the said equal-protection-of-the-law provisions of the California Constitution."

## III

Defendants advance three substantive contentions on appeal.

*First,* it is urged that the trial court employed inappropriate criteria insofar as it focussed on the notion of so-called "fiscal neutrality" to the exclusion of other factors relevant to its determination. If the trial court had employed appropriate criteria, it is suggested, the system as improved by S.B. 90 and A.B. 1267 would have been seen to be free from constitutional objection on equal protection grounds.

*Second,* defendants urge that an improper legal standard of equal protection review was utilized. The proper standard, it is contended, even under our state constitutional provisions, is that requiring no more than a rational relationship, critically analyzed, between the financing method chosen and some legitimate state purpose.

*Third,* and assuming that the financing system before the court is to some extent inconsistent with state constitutional provisions guaranteeing the equal protection of the laws, it is urged that those provisions are to that extent in conflict with other provisions of the state Constitution and, in accordance with the principle of consistency in constitutional interpretation, should be made to yield *pro tanto* in order to avoid such conflict.

## IV

Before taking up the foregoing contentions, we first dispose of a preliminary procedural matter. Defendants urge that the trial court was

without jurisdiction to proceed in this matter because two allegedly indispensable parties—the Legislature and the Governor—were not joined. (See Code Civ. Proc., § 389.) It is pointed out that "the operative and directory provisions" of the judgment "are addressed solely to the Legislative and Governor," and that the parties defendant in the action lack all power to bring about the relief sought by plaintiffs and awarded by the trial court—i.e., the restructuring of the state public school financing system in a manner which will comply with provisions of our state Constitution guaranteeing equal protection of the laws. Reference is made to certain legislative reapportionment cases, notably *Silver* v. *Brown* (1965) 63 Cal.2d 270 [46 Cal.Rptr. 308, 405 P.2d 132], and to the fact that the Governor and the members of the Legislature were there made parties. To do otherwise in this case, it is urged, "would deny [the] people who created this financing system through their elective representatives of their day in Court . . . ."

This contention is based on several misconceptions and inaccurate statements of the record. ■ First, it is clear that the trial court—wholly cognizant of the well-established principle, rooted in the doctrine of separation of powers (Cal. Const., art. III, § 3), that the courts may not order the Legislature or its members to enact or not to enact,[23] or the Governor to sign or not to sign,[24] specific legislation—by no means addressed the "operative and directory provisions" of its judgment to the Legislature and Governor. ■ On the contrary it simply declared that the public school financing system before it, which was administered by the parties defendant, was in violation of state constitutional provisions guaranteeing equal protection of the laws. The trial court also indicated that it would retain jurisdiction over the matter so that any party might apply for "appropriate relief"[25] in the event that the lawmakers and the Governor had failed within a reasonable time, set by

---

[23]See *French* v. *Senate* (1905) 146 Cal. 604, 606-607 [80 P. 1031]; *Myers* v. *English* (1858) 9 Cal. 341, 349; *California State Employees' Assn.* v. *State of California* (1973) 32 Cal.App.3d 103, 108-109 [108 Cal.Rptr. 60]; cf. *Igna* v. *City of Baldwin Park* (1970) 9 Cal.App.3d 909, 915 [88 Cal.Rptr. 581]; *Monarch Cablevision, Inc.* v. *City Council* (1966) 239 Cal.App.2d 206, 211 [48 Cal.Rptr. 550]; *City Council* v. *Superior Court* (1960) 179 Cal.App.2d 389, 394-395 [3 Cal.Rptr. 790].

[24]See *Jenkins* v. *Knight* (1956) 46 Cal.2d 220, 223 [293 P.2d 6]; *Harpending* v. *Haight* (1870) 39 Cal. 189, 208; *California State Employees' Assn.* v. *State of California, supra,* 32 Cal.App.3d 103, 109.

[25]The conclusions of law issued by the court clearly indicate that the primary relief contemplated, to be invoked only after the passage of a "reasonable time," is an injunction prohibiting the dendant state officials from operating an unconstitutional school financing system.

the judgment at six years, "to take the necessary steps to design, enact into law, and place into operation" a system which would comply with those provisions. However, it explicitly and properly refrained from issuing directives to the lawmakers and the chief executive, stating in its judgment: ". . . [T]his judgment is not intended to require, and is not to be construed as requiring, the adoption of any particular plan or system for financing the public elementary and secondary schools of the state . . . ."

■ Secondly, as the reapportionment cases themselves indicate, it is the general and long-established rule that in actions for declaratory and injunctive relief challenging the constitutionality of state statutes, state officers with statewide administrative functions under the challenged statute are the proper parties defendant. (See *Yorty* v. *Anderson* (1963) 60 Cal.2d 312, 317-318 [33 Cal.Rptr. 97, 384 P.2d 417], and cases there cited; cf. *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10]; *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].) The fact that in the reapportionment context the Legislature and its members may also be considered proper parties stems from the direct institutional interest of those parties in the determination. (See and cf.[26] *Silver* v. *Jordan* (S.D. Cal. 1964) 241 F.Supp. 576, 579, affirmed (1965) 381 U.S. 415 [14 L.Ed.2d 689, 85 S.Ct. 1572]; *Minnesota State Senate* v. *Beens* (1972) 406 U.S. 187, 194 [32 L.Ed.2d 1, 8, 92 S.Ct. 1477].) ■ In the instant case, on the other hand, as in the great majority of cases brought against state administrative officers to challenge the constitutionality of a statute or statutes administered by them, the Legislature and the Governor lack any similar interest. The interest they do have—that of lawmakers concerned with the validity of statutes enacted by them—is not of the immediacy and directness requisite to party status; it may thus be fully and adequately represented by the appropriate administrative officers of the state.

Moreover, even should the Legislature and the Governor be considered *proper* parties to this litigation (i.e., parties subject to permissive joinder or capable of intervention), it is clear that they could in no case be considered *indispensable* parties, or parties without whom the action could not fairly proceed. ■ Indispensable parties, as we said in *Bank of California* v. *Superior Court* (1940) 16 Cal.2d 516, at page 521 [106

[26]Although our California statute governing intervention (Code Civ. Proc., § 387) is not in all respects identical to the parallel federal rule (Fed. Rules Civ. Proc., rule 24), the requirement of significant interest is common to both.

P.2d 879], are parties "whose interests, rights, or duties will inevitably be affected by any decree which can be rendered in the action. Typical are the situations where a number of persons have undetermined interests in the same property, or in a particular trust fund, and one of them seeks, in an action, to recover the whole, to fix his share, or to recover a portion claimed by him. The other persons with similar interests are indispensable parties. The reason is that a judgment in favor of one claimant for part of the property or fund would necessarily determine the amount or extent which remains available to the others. Hence, any judgment in the action would inevitably affect their rights." ██ Manifestly, the Legislature and the Governor have no interest in this proceeding which is remotely comparable to that contemplated by this language.

Moreover, as we also said in the *Bank of California* case, in dealing with the doctrine of indispensable and necessary parties "we should . . . be careful to avoid converting a discretionary power or a rule of fairness in procedure [27] into an arbitrary and burdensome requirement which may thwart rather than accomplish justice." (16 Cal.2d at p. 521; see also *Muggill* v. *Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 241 [42 Cal.Rptr. 107, 398 P.2d 147].) In the instant case it is quite clear that no governmental interest has lacked for able and willing advocates in the absence of the Legislature and Governor as parties. This case has been well-known to those entities since its inception, yet they have at no point sought intervention or indicated any interest in doing so. Even more significantly, this is a matter whose resolution has been anxiously awaited by the parties and the public at large for more than seven years. In light of these considerations we are convinced that to invoke the doctrine of indispensability, and thus require the renewal of trial proceedings on this ground, would indeed be to "thwart rather than accomplish justice."

## V

██ Defendants' first substantive contention, as indicated above, concerns the criteria employed by the trial court in its examination of the school finance system before it. The trial court, it is urged, by confining its inquiry to the matter of wealth-related disparities among the several school districts, improperly ignored certain other factors—for example,

---

[27]Section 389 of the Code of Civil Procedure, enacted in 1971 to conform ours to the federal practice, describes an indispensable party as one which "in equity and good conscience" the court deems essential to the determination of the action. (See Fed. Rules Civ. Proc., rule 19.)

the "adequacy" and "equality" of educational programs[28]—and thus oversimplified the problem before it. This point of view, it is claimed, is reflected in the terms of the judgment itself. (See par. 4 of the judgment set forth *ante* in fn. 21.) The application of proper criteria, defendants argue, would require the trial court to look not merely to the operation of particular "mechanisms" utilized by the system but to the overall results achieved in terms of "a fair balance, statewide, between equal educational opportunities and local supplementation." To do otherwise, it is urged, is to adopt a nearsighted approach which, in its zeal to perfect one "mechanism" in the system, imposes a standard of "neutrality" upon all its other elements. "Municipal overburden," with its attendant problems, also covered by trial court findings, is cited by defendants as a particular example of an area requiring not "neutrality" but special efforts according to the circumstances.[29]

Defendants offer two formulations of what they consider to be adequate criteria for the assessment of the public school financing system. In their opening brief they suggest a tripartite test which is less an alternative to the "fiscal neutrality" approach of the trial court than what turns out to be defendants' description of the system at issue from the standpoint of its overall effect.[30] Perhaps realizing the unwieldiness

---

[28]Defendants single out for attack the following passage from the trial court's memorandum opinion: "What the *Serrano* court imposed as a California constitutional requirement is that there must be uniformity of treatment between the children of the various school districts in the State because all the children of the State in public schools are persons similarly circumscribed. The equal-protection-of-the-laws provisions of the California Constitution mandate nothing less than that all such persons shall be treated alike. If such uniformity of treatment were to result in all children being provided a low-quality educational program, or even a clearly *inadequate* educational program, the California Constitution would be satisfied. This court does not read the *Serrano* opinion as requiring that there is any constitutional mandate for the State to provide funds for each child in the State at some magic level to produce either an adequate-quality educational program or a high-quality educational program. It is only a disparity in treatment between equals which runs afoul of the California constitutional mandate of equal protection of the laws."

[29]Several of the briefs amicus curiae filed herein also evince serious concern for the problem of "municipal overburden."

[30]The three criteria suggested are these: "I. The system must assure that every school district in the State has access, without excessive local taxation, to sufficient general fund revenues to finance the commonly-shared needs of school districts as perceived by the State, and to such categorical aids as the State and Federal governments perceive to be required to meet special, uncommon needs of some districts. II. The system must permit revenues derived from local taxation to be used to supplement Type 1 revenues described above. III. The system as a whole must generate public school general fund revenues so as to result in Type 2 revenues constituting not more than a court-determined percentage of the State total of all school district general fund revenues."

of this formulation, they proceed in their reply brief to state the apparent kernel of their position in more straightforward terms: of the three types of revenues available to school districts—foundation funds, categorical aids, and local supplements—only the third, it is asserted, is "unequalized," or dependent upon taxable district wealth and the capacity or willingness of the voters to pay additional school taxes. The percentage of total state school district revenues represented by these "unequalized" revenues, defendants assert, "provides an objective measure of the relative weights given by the system in a given year to equal educational opportunities and local participation in school fiscal affairs." So long as this figure is sufficiently low—defendants suggest 10 percent as an appropriate figure—the relevant competing interests are adequately accommodated. This, then, is the "optimum balance" criterion which defendants would suggest that we utilize in preference to the "fiscal neutrality" approach of the trial court. If we were to do so, it is asserted, we would find that the subject system, as improved by the provisions of S.B. 90 and A.B. 1267, is in approximate compliance with the suggested standards.[31]

The fundamental defect in this argument is that it flies in the face of our holding in *Serrano I* and also of the findings of the trial court, which were carefully grounded on that holding. In *Serrano I* we held that if the allegations of the complaint were sustained—which allegations dealt not only with district disparities in revenue-producing capability but also with the effect of such disparities on the quality of education in the various districts (see *Serrano I, supra,* at p. 601, fn. 16)—then "the financial system must fall and the statutes comprising it must be found unconstitutional" as in violation of equal protection. (*Serrano I, supra,* at p. 615.) We described the system in question (i.e., the system alleged to exist in the complaint) as one which "conditions the full entitlement to [the interest in education] on wealth, classifies its recipients on the basis of their collective affluence[,] and makes the quality of a child's education depend upon the resources of his school district . . . ." (*Id.* at p. 614.) It follows, therefore, that any system in which the two basic

[31]Defendants concede that had this standard been applied to the financing system in 1971, at the time of *Serrano I,* it would necessarily have been concluded that the then system was not in compliance. At that time, it is asserted, "the relative values placed upon equal educational opportunities and local fiscal control [as reflected in the statewide ratio of 'equalized' to 'unequalized' revenues] were approximately 76.4% and 23.6%, respectively." On the other hand, it is urged, the application of the standard to the 1973-1974 system (i.e. the system as it stood following the enactment of S.B. 90 and A.B. 1267) would reveal a ratio of 89.6 percent "equalized" revenues to 10.4 percent "unequalized" revenues.

elements of this description are present—i.e., (1) the conditioning of the availability of school revenues upon district wealth, with resultant disparities in school revenue, and (2) the dependency of the quality of education upon the level of district expenditure—must be declared invalid unless it finds justification sufficient to satisfy the applicable equal protection test.[32]

The trial court, scrupulously adhering to the law as set forth in our previous opinion, concluded in essence that the new school financing system, although considerably improved over that which was before us in *Serrano I,* nevertheless retained the foregoing ingredients of the former system. This determination was recorded in no less than 299 findings of fact, none of which is challenged by defendants as lacking in substantial support. In these circumstances defendants cannot now be heard to maintain that different "criteria" should have been employed by the trial court. The "criteria" utilized by the trial court in assessing the discriminatory effect of the system before it were those enjoined upon the court by our opinion in *Serrano I.* Clearly there was no error in this respect.

Moreover, even if defendants' "optimum balance" argument were not foreclosed by our decision in *Serrano I*—and if it be further assumed that the recommended 90/10 ratio might be sufficient to satisfy constitutional demands[33]—it is apparent that the factual premises on which such argument is based are open to serious question.

In the first place, the figures upon which defendants base their assertion of present compliance with the suggested standard (see fn. 31, *ante,* and accompanying text) are drawn from 1973-1974 fiscal data, that is, data reflecting the immediate impact of the post-*Serrano I* enact-

[32]It is contended in this case, of course, that the equal protection standard utilized by us in *Serrano I* is no longer—after the U.S. Supreme Court's *Rodriguez* decision—the appropriate test. We consider this matter in due course. For the present we assert only this limited proposition: *Whatever* the applicable equal protection test, the findings of the trial court establish that discrimination of the character condemned in *Serrano I* has been shown to exist in the school financing system presently before us.

[33]It was stated by defendants at oral argument that the current budget statewide is in the neighborhood of $5 billion. To allow 10 percent of this sum, or $500 million, to be distributed pursuant to a system rendering access a function of taxable wealth would be far from an insignificant matter, especially when it is considered that it is those funds over and above the assertedly "equalized" level which are critical to a school district's ability to raise its program beyond a marginal level and respond with creativity and freedom of action to peculiar district needs and desires.

ments. It is clear, however, that in 1973-1974 the various pressures—notably increasing inflation and declining enrollment[34]—tending to augment the district ratio of local supplements to other revenues had not fully manifested themselves. Under the present system which, according to the trial court's findings, makes the ability of particular school districts to cope with such pressures vary according to the taxable wealth of the particular district, it can be expected that future years will see an increase statewide in the ratio of local supplements to other revenues. In such circumstances, the extent of an individual district's participation in the statewide increase will be geared to its taxable wealth. To ask, as defendants do, that we defer our notice of such probable future disparities to the time of their actual occurrence is to ask that we ignore inherent defects in the system which we are called upon to examine.

More fundamentally, however, we point out that the basic factual premise upon which defendants posit the above argument—namely that under the subject system 90 percent of total statewide school expenditures are "equalized" or, in other words, are *not* "dependent upon the taxable wealth in a school district and the capacity and willingness of the voters to pay additional school taxes"—is flatly and fully contradicted by the factual determinations of the trial court. The lion's share of those revenues asserted to be in the "equalized" category is composed of revenue represented by the foundation program (approximately 74 percent of all revenue), yet the trial court explicitly found that the tax effort required of a school district to attain the foundation level[35] varied according to the taxable wealth of that district. Thus, these revenues can by no means be considered "equalized" under defendants' own definition of that term. If we include foundation program funds among those funds which are "unequalized," the ratio becomes not 10 percent to 90 percent in favor of "equalized" revenues but approximately 84 percent to 16 percent in favor of "unequalized" revenues.

Finally, we offer some comments upon the complex problems associated with "municipal overburden," which defendants and some of

---

[34]The immediate effect of declining enrollments, of course, is a lowered ADA and a corresponding reduction in state-provided foundation program money to the affected district. The cost of education due to declining enrollment does not decline in the same proportion. Under the system here before us, the only remedy for this situation, barring dramatic increases in the amount of taxable wealth in a district, is an increased tax rate.

[35]As we point out later in this opinion, the fact that disparities in district wealth result in disparities in tax effort required to reach foundation levels is not by itself determinative of the issue before us. It is only insofar as such disparities have the effect of producing disparities in *educational opportunity* that they here concern us.

the amici curiae, notably the San Francisco Unified School District, see as a critical problem under any system of school financing. It is important to recognize at the outset that "municipal overburden" is a banner under which many armies march. Strictly speaking, the term relates to the phenomenon, prevalent in concentrated urban areas, of high property tax rates for governmental services other than education. Such a phenomenon, it is suggested, must be taken into account when comparing school tax rates in various districts; a lower school tax rate in an urban area, it is urged, cannot be realistically compared with higher tax rates in suburban or rural areas in terms of "equal tax effort" because the taxpayers residing in districts in the latter areas may bear a lighter overall tax burden in terms of a total rate.[36] As the trial court found, however, the phenomenon in question is not limited in its occurrence to districts such as San Francisco where a relatively high assessed valuation (due to a concentration of business and industry) combined with a comparatively small ADA permits a relatively low school tax rate. On the contrary, the residents of districts in Los Angeles, San Diego, and San Jose, for example—with a much lower assessed valuation per ADA[37]—suffer from the same typically urban problems and require similarly high nonschool tax rates to meet them. The system before us, by tying a district's ability to respond to its educational needs and desires to its taxable wealth per ADA, clearly discriminates among equally beleaguered urban districts from the point of view of their respective

---

[36]The following statistics comparing San Francisco with neighboring counties, derived from the 1974 California Statistical Abstract, are provided by defendants in illustration of this point:

| | Average School Tax Rate | Average Other Purpose Rate | Average Total Rate |
|---|---|---|---|
| Contra Costa | $6.86 | $5.85 | $12.71 |
| Marin | 6.64 | 4.63 | 11.27 |
| San Francisco | 4.47 | 7.30 | 11.77 |
| San Mateo | 6.31 | 3.55 | 9.86 |
| State Average | $5.91 | $5.24 | $11.15 |

[37]Statistics published by the California State Department of Education contain the following figures relative to comparative assessed valuation per ADA (1973-1974) in the indicated areas.

| District | "Modified Assessed Valuation Per Unit Of Second Period a.d.a., 1973-1974" | |
|---|---|---|
| | Elementary | High School |
| Los Angeles Unified | $22,857 | $ 46,182 |
| San Diego Unified | 21,376 | 52,109 |
| San Jose Unified | 21,533 | 47,722 |
| San Francisco Unified | 57,658 | 116,328 |

(1973-1974 California Public Schools, Selected Statistics, Table IV - 11.)

capacities to bring educational benefits to the students resident within their borders.[38]

The term "municipal overburden" is also sometimes used to designate certain problems related not to high nonschool tax rates but to additional burdens of school expenditure imposed upon urban districts by the facts of urban life. When there is widespread poverty, disadvantaged youth, and bilingualism in a district, it is argued, not only do purely educational costs rise due to the necessity for increased effort to overcome motivational and adaptive problems, but costs related to matters like vandalism rise as well. Again, however, the incidence of these problems is not

---

[38]Defendants also advance several arguments relating to what they term in their brief "the search for tax equity." These arguments, generally speaking, relate to the fact that the level of assessed valuation per ADA in a particular school district tells us little about the income level of families residing within that district. Thus, in many cases a relatively high assessed valuation per ADA will accompany a relatively low median family income; this would normally occur as a result of the presence of substantial business and/or industrial properties within a district whose residents suffer from relative poverty from the point of view of average family income. At the other extreme are districts in which the assessed valuation per ADA is relatively low in spite of a relatively high median family income; this combination would typically be present in a community having no significant business or industry where the emphasis is on single-family dwellings—i.e., a relatively "affluent" (from the standpoint of the standard of living of inhabitants) suburb. A "fiscally neutral" system, defendants fear, might result in taking from the "poor" city (which in spite of a lower median income level has a higher assessed valuation per ADA) in order to give to the "rich" suburb (which in spite of a higher median income level has a lower assessed valuation per ADA). This, it is urged, would be an intolerable anomaly—especially in view of the fact, adverted to above (see fn. 36, ante, and accompanying text), that in many cases under the present system a property-rich city, in spite of its lower school tax rate, will impose a total tax rate comparable to or in excess of the total tax rate in an income-rich suburb.

The dispositive answer to the above arguments is simply that this court is not now engaged in—nor is it about to undertake—the "search for tax equity" which defendants prefigure. As defendants themselves recognize, it is the Legislature which, by virtue of institutional competency as well as constitutional function (see *Haman* v. *County of Humboldt* (1973) 8 Cal.3d 922, 925-926 [106 Cal.Rptr. 617, 506 P.2d 993], and cases there cited; cf. *Community Redevelopment Agency* v. *Abrams* (1975) 15 Cal.3d 813, 828-832 [126 Cal.Rptr. 473, 543 P.2d 905]), is assigned that difficult and perilous quest. Our task is much more narrowly defined: it is to determine whether the trial court committed prejudicial legal error in determining whether the state school financing system at issue before it was violative of our state constitutional provisions guaranteeing equal protection of the laws insofar as it denies equal educational opportunity to the public school students of this state. If we determine that no such error occurred, we must affirm the trial court's judgment, leaving the matter of achieving a constitutional system to the body equipped and designed to perform that function. Broad considerations of "tax equity," while they will certainly be a matter of immediate concern to the Legislature in carrying out such a task, are pertinent to our present determination only insofar as it is shown that the system before us, through its imposition of burdens and bestowal of benefits, results in impermissible disparity in the level of educational opportunity available to the students of the various school districts of this state.

limited to districts of any particular level of wealth per ADA. From the point of view of providing education, those districts which are able to meet the above problems because of a relatively high assessed valuation per ADA are clearly favored over districts which lack that advantage.

The immediately foregoing discussion reveals but one aspect of a more fundamental and pervasive problem. As defendants state the matter in their reply brief: "The weak relationship between expenditures per pupil and taxable wealth per pupil . . . is explained in part by factors affecting the cost of offering substantially equivalent school programs in different school districts. For example, some school districts have old buildings which require expensive maintenance; some have a disproportionate number of older teachers entitled to higher salaries; some must spend excessive amounts for security, and for the repair of vandalized buildings. Some high schools in remote parts of the State have only a few students and must maintain costly classes for less than ten students. Some schools must insulate rooms to keep out distracting noise from airports or freeways. Some are located in parts of the State where climatic conditions require unusually high expenditures for heating or air conditioning." Under the system we here examine, however, the ability of a school district to meet those problems peculiar to it depends in large part upon the taxable wealth of that district per ADA. A fiscally neutral system, if tailored in a responsive and responsible way, would in no way resemble the specter which defendants raise. Rather, it would make the individual district's ability to meet its own particular problems connected with providing educational opportunity depend upon factors other than the wealth of the district, and thus dissipate the discrimination which characterizes the system before us.

For all of the foregoing reasons we reject in its entirety defendants' constellation of contentions dealing with the criterion of "fiscal neutrality" adopted by the trial court. We have concluded, upon a complete review of the findings and the evidence, that the discrimination in public school financing of which plaintiffs complain has been shown to exist under the system here at issue, and that the trial court, in so finding, employed proper criteria. We now proceed to address the question whether the system as shown to exist is invalid as in violation of constitutional guarantees.

## VI

In *Serrano I* this court, in its determination of whether or not the allegations of the complaint stated a cause of action, was faced at the

outset with the task of choosing the proper equal protection standard to be applied. "[T]he United States Supreme Court," we pointed out, "has employed a two-level test for measuring legislative classifications against the equal protection clause. 'In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. . . . [¶] On the other hand, in cases involving "suspect classifications" or touching on "fundamental interests," . . . the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. . . . Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' " (*Serrano I* at p. 597, quoting from *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224].)

Concluding on the basis of the complaint that the case before us involved both a "suspect classification" (because the discrimination in question was made on the basis of wealth) and affected a "fundamental interest" (education), we proceeded to apply the latter standard. Addressing ourselves to the state interest advanced by defendants—local decision-making power and fiscal control—we concluded that it was not incumbent upon us to decide whether that asserted interest was "compelling" or whether the existing financial system was "necessary" to its furtherance because under the facts as alleged the notion of local control was a "cruel illusion for the poor school districts" due to limitations placed upon them by the system itself. "In summary," we held, "so long as the assessed valuation within a district's boundaries is a major determinant of how much it can spend for its schools, only a district with a large tax base will be truly able to decide how much it really cares about education. The poor district cannot freely choose to tax itself into an excellence which its tax rolls cannot provide. Far from being necessary to promote local fiscal choice, the present financing system actually deprives the less wealthy districts of that option." (*Serrano I* at p. 611.)

During the progress of trial proceedings below, the United States Supreme Court rendered its decision in *San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1. There, addressing itself to an

equal protection attack on the Texas public school financing system—which like the system here in question is based on the "foundation approach"—the high court held that that system (1) did not result in a suspect classification based upon wealth, and (2) did not affect any fundamental interest, education being less than fundamental for these purposes because it was not explicitly or implicitly guaranteed or protected by the terms of the federal Constitution. (*Id.,* at pp. 33-34, 61-62 [36 L.Ed.2d at pp. 42-43, 59-60].) Accordingly, the court held, the so-called "strict scrutiny test" for equal protection review of state laws under the Fourteenth Amendment to the United States Constitution was inappropriate. Reinforced in this conclusion by the fact that the case before it involved peculiarly local questions of taxation, fiscal planning, and educational policy—and thus raised serious considerations of federalism and deference to local decision (*id.,* at pp. 40-44 [36 L.Ed.2d at pp. 47-50])—the high court proceeded to examine the Texas system under the less stringent "rational relationship" test, concluding that such a relationship to the state purpose of local control was shown.[39] (*Id.,* at pp. 48-55 [36 L.Ed.2d at pp. 51-56].)

We—along with the trial court and the parties—think it is clear that *Rodriguez* undercuts our decision in *Serrano I* to the extent that we held the California public school financing system (if proved to be as alleged) to be invalid as in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. However, as we made clear in footnote 11, our decision in *Serrano I* was based not only on the provisions of the federal Constitution but on the provisions of our own state Constitution as well.

Our footnote 11 read as follows: "The complaint also alleges that the financing system violates article I, sections 11 and 21 [now in substance article IV, section 16 and article I, section 7(b)] of the California Constitution. Section 11 provides: 'All laws of a general nature shall have a uniform operation.' Section 21 states: 'No special privileges or

---

[39]Among the four dissenters, Justice White specifically grounded his disagreement with respect to this latter point on the very basis upon which we had refused to consider "local control" as a "compelling state interest" in *Serrano I*—i.e., that the notion of local control for less wealthy districts was chimerical. (*Id.,* at pp. 63-70 [36 L.Ed.2d at pp. 60-65]; see also dis. opn. by Marshall, J., pp. 127-130 [36 L.Ed.2d at pp. 97-100].) The difference, of course, was that we had looked to this consideration in our application of the so-called "strict scrutiny test," whereas Justice White—apparently agreeing with the majority that that test was inappropriate for federal purposes in the circumstances there present—utilized it in order to conclude that the state had failed to demonstrate any rational relationship between its system and the asserted interest.

immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens.' We have construed these provisions [40] as 'substantially the equivalent' of the equal protection clause of the Fourteenth Amendment to the federal Constitution. (*Dept. of Mental Hygiene* v. *Kirchner* (1965) 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321].) Consequently, our analysis of plaintiffs' federal equal protection contention is also applicable to their claim under these state constitutional provisions." (*Serrano I* at p. 596.) The first question here facing us is that of the proper interpretation of the foregoing two sentences in light of *Rodriguez*.

Three possible interpretations of this language have been suggested to us. All proceed on the premise properly embraced by all parties hereto, that the footnote's citation of our second *Kirchner* opinion forecloses any argument that a classification which satisfies federal equal protection standards by the same token satisfies our own constitutional provisions. [41] Granting this, however, defendants argue that our reliance in *Serrano I* on United States Supreme Court cases dealing with the proper application of the strict scrutiny standard of review must be reexamined in light of *Rodriguez,* and that such reexamination must result in the conclusion that neither a "suspect classification" nor a "fundamental interest" is here involved, precluding use of a strict scrutiny standard for purposes of resolving the *state* constitutional question. Plaintiffs, on the other hand, urge that removal of the *federal* ground by *Rodriguez* leaves our *Serrano I* rationale wholly intact on *state* grounds. Alternatively they argue that if *Rodriguez* is to be utilized by analogy in applying our state constitutional provisions—so that, for example, a "fundamental interest" for *state* purposes would be held to exist only if the right in question is explicitly

---

[40]The passage of Proposition 7 at the 1974 General Election added the following provision to our Constitution as article I, section 7, subdivision (a): "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws."

[41]In the indicated *Kirchner* opinion this court, responding to a mandate of the United States Supreme Court essentially inquiring whether our decision in *Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353] had an independent state ground, held that the conclusion reached, although in our view required by the equal protection clause of the Fourteenth Amendment, was in any event independently required by our state equal protection provisions. "We so conclude by our construction and application of California law," this court said, *"regardless of whether there is or is not compulsion to the same end by the federal Constitution."* (62 Cal.2d at p. 588; italics added. (See Karst, *Serrano* v. *Priest: A State Court's Responsibilities and Opportunities in The Development of Federal Constitutional Law* (1972) 60 Cal.L.Rev. 720, 743-748.)

ɔr implicitly guaranteed by the *state* Constitution—the interest in education will be seen to meet this test.[42] This, it will be recalled, was the theory adopted by the trial court (see fn. 19, *ante,* and accompanying text).

The primary position adopted by plaintiffs on this point is the correct one. As *Serrano I* makes clear through its reference to our second *Kirchner* opinion (and as all parties hereto are agreed), our state equal protection provisions, while "substantially the equivalent of" the guarantees contained in the Fourteenth Amendment to the United States Constitution, are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable. We have recently stated in a related context: "[I]n the area of fundamental civil liberties—which includes . . . all protections of the California Declaration of Rights—we sit as a court of last resort, subject only to the qualification that, our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is California law and the full panoply of rights Californians have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law." (*People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753]; see also *People* v. *Disbrow* (1976) 16 Cal.3d 101, 114-115 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Norman* (1975) 14 Cal.3d 929, 939 [123 Cal.Rptr. 109, 538 P.2d 237]; *People* v. *Brisendine* (1975) 13 Cal.3d

---

[42]Three sections of our state Constitution are explicitly cited in support of this proposition. They are:

(1) Article IX, section 1: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement."

(2) Article IX, section 5: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established."

(3) Article XVI, section 8 (formerly art. XIII, § 15): "From all state revenues there shall first be set apart the monies to be applied by the state for support of the public school system and public institutions of higher education."

Amicus curiae Childhood and Government Project, which joins in the instant contention, does not shrink from passionate imagery in describing its position. Whereas, we are told, "the federal claim of fundamentality had to be argued in *Rodriguez* as a remote inference from the general language of the Bill of Rights[,] [u]nder California law the conclusion *thunders from the words of the* [C]*onstitution itself.*[!]"

528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099]; *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 245-246 [118 Cal.Rptr. 166, 529 P.2d 590]; *Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596, 615-617 [127 Cal.Rptr. 244]; *State* v. *Kaluna* (1974) 55 Hawaii 361 [520 P.2d 51, 58-59]; *Baker* v. *City of Fairbanks* (Alaska 1970) 471 P.2d 386, 401-402;[43] see generally Note, *Project Report: Toward An Activist Role for State Bills of Rights* (1973) 8 Harv. Civ. Rights—Civ. Lib.L.Rev. 271; Falk, *Foreword: The State Constitution: A More Than "Adequate" Nonfederal Ground* (1973) 61 Cal.L.Rev. 273; Note, *Rediscovering the California Declaration of Rights* (1974) 26 Hastings L.J. 481.)

Thus, the fact that a majority of the United States Supreme Court have now chosen to contract the area of active and critical analysis under the strict scrutiny test for federal constitutional purposes[44] can have no effect upon the existing construction and application afforded our own constitutional provisions. Nor can the additional fact—if it be a fact—that certain of the high court's former decisions (which may have been relied upon by us in *Serrano I*) may not be expected to thrive in the shadow of *Rodriguez* cause us to withdraw from the principles we there announced on state as well as federal grounds.

For these reasons then, we now adhere to our determinations, made in *Serrano I*, that for the reasons there stated and for purposes of assessing our state public school financing system in light of our state constitutional provisions guaranteeing equal protection of the laws (1) discrimination

[43]We find the language of the Alaska Supreme Court to be particularly apposite in this respect: "While we must enforce the minimum constitutional standards imposed upon us by the United States Supreme Court's interpretation of the Fourteenth Amendment, we are free, and we are under a duty, to develop additional constitutional rights and privileges under our . . . Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage. We need not stand by idly and passively, waiting for constitutional direction from the highest court of the land. Instead we should be moving concurrently to develop and expound the principles embedded in our constitutional law." (471 P.2d at pp. 401-402, fns. omitted.)

[44]We do not think it open to doubt that the *Rodriguez* majority had considerable difficulty accommodating its new approach to certain of its prior decisions, especially in the area of fundamental rights. Indeed, we share the curiosity of Justice Marshall, who in his dissent states that he "would like to know where the Constitution guarantees the right to procreate, *Skinner* v. *Oklahoma* [ex rel. *Williamson*], 316 U.S. 535, 541 (1942) [86 L.Ed. 1655, 1660, 62 S.Ct. 1110], or the right to vote in state elections, *e.g., Reynolds* v. *Sims,* 377 U.S. 533 (1964) [12 L.Ed.2d 506, 84 S.Ct. 1362], or the right to an appeal from a criminal conviction, *e.g., Griffin* v. *Illinois,* 351 U.S. 12 (1956) [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055]." (*Rodriguez, supra,* at p. 100 [36 L.Ed.2d at p. 82].)

in educational opportunity on the basis of district wealth involves a suspect classification, and (2) education is a fundamental interest. Because the school financing system here in question has been shown by substantial and convincing evidence produced at trial to involve a suspect classification (insofar as this system, like the former one, draws distinctions on the basis of district wealth), and because that classification affects the fundamental interest of the students of this state in education, we have no difficulty in concluding today, as we concluded in *Serrano I,* that the school financing system before us must be examined under our state constitutional provisions with that strict and searching scrutiny appropriate to such a case.[45]

We are fortified in reaching this conclusion by language appearing in the *Rodriguez* decision itself. The high court, in passing upon the validity of the Texas system under the federal equal protection clause, repeatedly emphasized its lack of "expertise" and familiarity with local problems of school financing and educational policy, which lack "counsel[ed] against premature interference with informed judgments made at the state and local levels." (*Rodriguez, supra,* at p. 42 [36 L.Ed.2d at p. 48].) These considerations, in conjunction with abiding concerns from the standpoint of federalism,[46] in the high court's view "buttress[ed] [its] conclusion that Texas' system of public school finance is an inappropriate candidate for strict judicial scrutiny." (*Id.,* at p. 44 [36 L.Ed.2d at p. 49].) This court, on the other hand, in addressing the instant case occupies a position quite different from that of the high court in *Rodriguez.* The constraints of

[45]In view of this conclusion we need not address the problem, raised in pointed and lucid fashion by one of the amici curiae, whether in applying our *state* equal-protection provisions we should insist upon strict scrutiny review of all governmental classifications based on wealth, thus elevating such classifications to a level of "suspectedness" equivalent to those based on race. The classification here in question, which is based on district wealth, clearly affects the fundamental interest of the children of the state in education, and we hold here, as we held in *Serrano I* (see especially pp. 614-615), that this combination of factors warrants strict judicial scrutiny under our state equal-protection provisions.

[46]The high court explained its misgivings on the federalism question as follows: "It must be remembered, also, that every claim arising under the Equal Protection Clause has implications for the relationship between national and state power under our federal system. Questions of federalism are always inherent in the process of determining whether a State's laws are to be accorded the traditional presumption of constitutionality, or are to be subjected instead to rigorous judicial scrutiny. While '[t]he maintenance of the principles of federalism is a foremost consideration in interpreting any of the pertinent constitutional provisions under which this Court examines state action,' it would be difficult to imagine a case having a greater potential impact on our federal system than the one now before us, in which we are urged to abrogate systems of financing public education presently in existence in virtually every State." (*Id.,* at p. 44; fn. omitted [36 L.Ed.2d at p. 49].)

federalism, so necessary to the proper functioning of our unique system of national government, are not applicable to this court in its determination of whether our own state's public school financing system runs afoul of state constitutional provisions. Moreover, while we cannot claim that we have achieved the perspective of "expertise" on the subjects of school financing and educational policy, our deliberations in this matter have had the benefit of a thoughtfully developed trial record (comprising almost 4,000 pages of testimonial transcript, replete with the opinions of experts of various accomplishments and persuasions, and a clerk's transcript of almost equal size), comprehensive if not exhaustive findings on the part of an able trial judge, and voluminous briefing by the parties and no less than nine amici curiae, among which are included the state Superintendent of Public Instruction. We believe that this background amply equips us to undertake the searching judicial scrutiny of our state's public school financing system which is required of us under our state constitutional provisions guaranteeing equal protection of the laws.

We point out in closing, however, that our application of the strict scrutiny test in this case should in no way be interpreted to imply an acceptance of the theory, adopted by the trial court and advanced as an alternative rationale by plaintiffs and some of their supporting amici, by which the *Rodriguez* approach to assessing "fundamentalness" in affected rights is applied by analogy in the state sphere. (See fn. 20, *ante,* and accompanying text.) Suffice it to say that we are constrained no more by inclination than by authority to gauge the importance of rights and interests affected by legislative classifications wholly through determining the extent to which they are "explicitly or implicitly guaranteed" (*Rodriguez, supra,* at p. 33 [36 L.Ed.2d at p. 43]) by the terms of our compendious, comprehensive, and distinctly mutable state Constitution.[47] In applying our state constitutional provisions guaranteeing equal protection of the laws we shall continue to apply strict and searching judicial scrutiny to legislative classifications which, because of their impact on those individual rights and liberties which lie at the core of

---

[47]In the 1970 report of the California Constitution Revision Commission (proposed revision 3, part I (introduction) p. 7) it is stated: "Between 1879 and 1964 our Constitution was amended over 300 times. Its length increased from 16,000 to more than 75,000 words, and it was 10 times longer than the United States Constitution." Largely as a result of the work of the commission, amendments made subsequent to 1964 have reduced the sheer size of the document somewhat, but it remains today, as it was aptly termed over two decades ago, "A Prolix And Formidable Charter . . . hardly adapted to be a convenient rallying code or symbol for the ideologies of democracy." (Palmer & Selvin, The Development of Law in Cal., spec. feature in 1 Ann. Const., West's Ann. Cal. Codes (1954 ed.) pt. IV, at pp. 26-27.)

our free and representative form of government,[48] are properly considered "fundamental."

## VII

For the reasons above stated, we have concluded that the state public school financing system here under review, because it establishes and perpetuates a classification based upon district wealth which affects the fundamental interest of education, must be subjected to strict judicial scrutiny in determining whether it complies with our state equal protection provisions. ▮ Under this standard the presumption of constitutionality normally attaching to state legislative classifications falls away, and the state must shoulder the burden of establishing that the classification in question is necessary to achieve a compelling state interest. (*Serrano I* at p. 597; see also *Weber* v. *City Council* (1973) 9 Cal.3d 950, 958-959 [109 Cal.Rptr. 553, 513 P.2d 601].) ▮ Basing our determination upon the amply supported factual findings of the trial court, which we have summarized in part II above, we conclude without hesitation that the trial court properly determined that the state failed to bear this burden.

Our reasons for this conclusion are essentially those stated by us on this point in *Serrano I*. The system in question has been found by the trial court, on the basis of substantial and convincing evidence, to suffer from the same basic shortcomings as that system which was alleged to exist in the original complaint—to wit, it allows the availability of educational opportunity to vary as a function of the assessed valuation per ADA of taxable property within a given district. The state interest advanced in justification of this discrimination continues to be that of local control of fiscal and educational matters. However, the trial court has found that asserted interest to be chimerical from the standpoint of those districts which are less favored in terms of taxable wealth per pupil, and we ourselves, after a thorough examination of the record, are in wholehearted agreement with this assessment.

The admitted improvements to the system which were wrought by the Legislature following *Serrano I* have not been and will not in the foreseeable future be sufficient to negate those features of the system

---

[48]We do not suggest, of course, that the treatment afforded particular rights and interests by the provisions of our state Constitution is not to be accorded significant consideration in determinations of this kind. We do suggest that this factor is not to be given conclusive weight.

which operate to perpetuate this inequity. Foremost among these—especially in a period of rising inflation and restrictive revenue limits—is the continued availability of voted tax overrides which, while providing more affluent districts with a ready means for meeting what they conceive as legitimate and proper educational objectives, will be recognized by the poorer districts, unable to support the passage of such overrides in order to meet equally desired objectives, as but a new and more invidious aspect of that "cruel illusion" which we found to be inherent in the former system. (*Serrano I* at p. 611.) In short, what we said in our former opinion in this respect is equally true here. "[S]o long as the assessed valuation within a district's boundaries is a major determinant of how much it can spend for its schools, only a district with a large tax base [per ADA] will be truly able to decide how much it really cares about education. The poor district cannot freely choose to tax itself into an excellence which its tax rolls cannot provide. Far from being necessary to promote local fiscal choice, the present financing system actually deprives the less wealthy districts of that option." (*Id.*)

It is accordingly clear that the California public school financing system here under review, because it renders the educational opportunity available to the students of this state a function of the taxable wealth per ADA of the districts in which they live, has not been shown by the state to be necessary to achieve a compelling state interest.[49] ▮▮▮ Defendants, however, have one more string to their bow: they, joined by one of the amici curiae, contend that even in the event of such a holding by this court the financing system before us cannot be held to be in violation of state equal protection provisions, because other provisions of our state Constitution specifically authorize just such a system. It is to this contention that we now turn.

## VIII

▮▮▮ Defendants' claim of specific state constitutional authorization for the public school financing system before us is primarily based upon

---

[49]As has been indicated in footnote 19, *ante,* the trial court found that, in addition to being invalid under the strict scrutiny test, "[t]he school financing system for the State of California violates the equal-protection provisions of the California Constitution even under the lesser constitutional standard of rational relationship." While it is unnecessary for us to direct ourselves to this matter, we do observe that we perceive no *rational* relationship between the asserted governmental end of maximizing local initiative and a system which provides realistic options to exercise such initiative only in proportion to district wealth per ADA. (Cf. *San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1, 63-70 [36 L.Ed.2d 16, 60-65] (dis. opn. of White, J.).)

the terms of article XIII, section 21, which provides: "Within such limits as may be provided under Section 20 of this Article [allowing the Legislature to provide maximum local property tax rates and bonding limits], the Legislature shall provide for an annual levy by county governing bodies of school district taxes sufficient to produce annual revenues for each district that the district's board determines are required for its schools and district functions." The argument, generally stated, is that a harmonious interpretation of this section along with other provisions requiring equal protection of the laws must operate to insulate distinctions based on district wealth disparities from state equal protection requirements. The argument proceeds on two distinct levels. First, it is urged, we held in *Serrano I* that the system there before us was "authorized" and "mandated" by the predecessor to article XIII, section 21 (former art. IX, § 6, par. 6); that holding, defendants and their supporting amicus assert, is now the law of the case, and to the extent that the system here in question shares in the shortcomings of the former system related to district wealth disparities, it too is so "authorized" and "mandated." Second, it is pointed out, even if we are not compelled to this conclusion by the doctrine of the law of the case, the terms of the section compel the indicated result. We take up these contentions in order.

At pages 595 and 596 of our opinion in *Serrano I,* in rejecting plaintiffs' contention that the system there alleged to exist was violative of the provisions of article IX, section 5 (requiring "a system of common schools"), we observed that former article IX, section 6, paragraph 6 (now art. XIII, § 21), the provision here at issue, "specifically authorizes the very element of the fiscal system of which plaintiffs complain." (*Id.,* at p. 596.) At a later point in the opinion, rejecting a contention of defendants that only de facto discrimination was here involved, we had occasion to observe that "[t]he school funding scheme is mandated in every detail by the California Constitution and statutes." (*Id.,* at p. 603.) It is urged that these two references, taken together, represent a holding that the system there before us was *required* by the terms of present article XIII, section 21. Insofar as the system now under examination shares in the features of the former system which we found objectionable in *Serrano I,* defendants argue, it is equally *required* by that section under the doctrine of the law of the case.

We reject such contentions as being utterly devoid of merit. Indeed, as we shall make clear, defendants' seizure upon such fragments of our

opinion in *Serrano I* as a basis of argument not only results in an unreasoned distortion of such language but more unfortunately displays an attempt to circumvent the rationale of *Serrano I* (now the law of the case) by emphasizing isolated words out of context. It is beyond question—and beyond cavil—that in stating that former article IX, section 6 "specifically authorizes the very element of the fiscal system of which plaintiffs complain," we had reference to that "element" of the system permitting variations in expenditures per ADA among the several districts. This is made clear by the context of the statement and the language following it. Former section 5 of article IX (the "common schools" provision) should not, we held, be interpreted to apply to school financing and require "uniform educational expenditures" because such an interpretation would render it inconsistent with former section 6 (the provision here at issue) which allows variation in school district expenditures. This was not to say, however, that former section 6 "authorized" or "approved" a system *in which such variation was the product of disparities in district wealth.* Any such conclusion would clearly have been at odds with our ultimate conclusion in *Serrano I* that the system there alleged to exist was violative of *state as well as federal* equal protection provisions. (5 Cal.3d at 596, fn. 11.) (See generally Part VI, *ante.*)

Similarly, by saying later on in our opinion, in disposing of an entirely different contention, that the school funding scheme was "mandated in every detail by the California Constitution *and statutes*" (*id.,* at p. 603; italics added), we in no way implied that the constitutional provision in question "mandated" the system there alleged to exist. The constitutional provision, as we shall point out more fully below, "mandated" only that there be a system allowing for local decision as to the level of school expenditures and that the mechanism to be utilized in providing revenues to permit such expenditures be a county levy of school district taxes. It was the *statutes* enacted under the aegis of that provision which tied the efficacy of local decision to district wealth.

We conclude for the foregoing reasons[50] that the doctrine of the law of the case is not helpful to defendants on this point. It remains for us to

---

[50]Two additional points in this respect raised by our esteemed colleague in dissent are equally devoid of merit. The requirements of section 20701 et seq. of the Education Code, which in the words of *Serrano I* "authorized the governing body . . . to levy taxes on the real property within a school district at a rate necessary to meet the district's annual education budget" (5 Cal.3d at p. 592) are of course statutory rather than constitutional in stature. Moreover, as we point out below, such a requirement would in no way mandate a system, such as that before us, in which through the creation of

undertake an interpretation of article XIII, section 21 (former art. IX, § 6, par. 6) in order to determine whether that provision *requires* a public school financing system which, like that before us, makes local decisions affecting educational opportunity depend for their effectiveness upon the taxable wealth per ADA in the district. We conclude without hesitation that it does not.

As we have noted above, article XIII, section 21 of the state Constitution provides that the Legislature, within certain limits set by established maximum tax rates and bonding limits, "shall provide for an annual levy by county governing bodies of school district taxes sufficient to produce annual revenues for each district that the district's board determines are required for its schools and district functions." In so doing the provision both authorizes the Legislature to establish a mechanism by which the revenues "required" for each district are to be produced, and describes the character of that mechanism—i.e., "an annual levy by county governing bodies of school district taxes." The provision does not, however, address itself to the question of the tax base to which the levy is to be applied, nor does it speak in terms of assessed valuation in any respect. Manifestly it does not authorize disparities in school district expenditures based upon the relative wealth per ADA of a particular school district. Such disparities, insofar as they have been here shown to exist, are the result of *legislative action, not constitutional mandate.*

Article IX, section 14 of the state Constitution clearly establishes that it is the Legislature which bears the ultimate responsibility for establishing school districts and their boundaries.[51] By its exercise of this power, and by the concurrent exercise of its powers under article XIII, section 21 to provide for a school financing mechanism based upon county levies of school district taxes, it has created a system whereby disparities in assessed valuation per ADA among the various school districts result in disparities in the educational opportunity available to the students within such districts. Thus, as we said in *Serrano I,*

districts of varying degrees of wealth per ADA the Legislature would foster disparities in educational opportunity. Similarly our statement in *Serrano I* that former article IX, section 6 (now art. XIII, § 21), "specifically authorizes local districts to levy school taxes" (5 Cal.3d at p. 598, fn. 12) in no way implies that that section authorizes a system in violation of the requirements of equal protection.

[51]The section in question provides as here relevant: "The Legislature shall have power, by general law, to provide for the incorporation and organization of school districts, high school districts, and community college districts, of every kind and class, and may classify such districts."

"[g]overnmental action drew the school district boundary lines, thus determining how much local wealth each district would contain [citations]." (5 Cal.3d at p. 603.) It is that action, which we reiterate is the product of *legislative* determinations,[52] that we today hold to be in violation of our state provisions guaranteeing equal protection of the laws.[53]

It seems to be argued, however, that because article XIII, section 21 authorizes the financing of schools by a county levy of school district taxes, the Legislature is free to structure a system based upon this mechanism in any way that it chooses. Such a notion, we hasten to point out, is manifestly absurd. A constitutional provision creating the duty and power to legislate in a particular area always remains subject to general constitutional requirements governing all legislation unless the intent of the Constitution to exempt it from such requirements plainly appears.

In *In re Jacobson* (1936) 16 Cal.App.2d 497 [60 P.2d 1001], for example, the Legislature, acting pursuant to its power to create a system of inferior courts (former art. VI, § 11a), did so in a manner which granted greater jurisdiction to city courts in populous townships than to the same class of courts of less populous townships—regardless of the population of the particular city. This, it was held, was in violation of the fundamental constitutional requirement that laws of a general nature have a uniform application. *"The legislature derives its power to create courts from the Constitution,"* the court stated, *"but it may do so only in*

---

[52]The dissenting opinion, in reaching the opposite conclusion, is guilty of a clear non sequitur. Starting from the proposition that section 21 "requires . . . a . . . system in which each county may levy annually a school district tax in an amount sufficient (when supplemented by state aid) to provide the revenues deemed necessary by each district in that county," it then proceeds to make reference to article XIII, section 14, of the Constitution which requires that all property taxed by local government be assessed in the county, city and district in which it is situated. From these premises it goes on to conclude that section 21 "necessarily . . . contemplates a school financing system in which each individual district's needs are satisfied from the taxable wealth of that district . . . ." Assuming without conceding this to be so, however, it by no means follows that the system so contemplated is, as the dissent puts it, "the present system which the majority find unconstitutional." The present system, as we have shown, is the product of legislative judgment, not constitutional command.

[53]The learned trial judge disposed of the present contention pointedly and irrefutably: "The rationale which impresses this court is that section 6 of Article IX [now § 21 of Article XIII] of the California Constitution did not create the various school districts with their geographical boundaries and with their differences in property wealth. Section 6, Article IX, [i.e., § 21 of Article XIII] is written to apply to whatever school districts have been created by the California Legislature."

*conformity with the provisions of the Constitution.* It doubtless has the right to classify cities according to population, and having made such classification to prescribe different powers and regulations for each of the classes. The powers and regulations must, however, be uniform for each of the classes." (16 Cal.App.2d at p. 500; italics added.)

Similarly, in *Mordecai* v. *Board of Supervisors* (1920) 183 Cal. 434 [192 P. 40] the Legislature, acting pursuant to its constitutional power to create and regulate the affairs of irrigation districts (former art. XI, § 13), enacted a comprehensive irrigation plan which exempted from its provisions those districts located in counties which had adopted a charter prior to a specific date. This, we concluded, it could not do. "It is argued, in effect, that this provision [former art. XI, § 13] empowers the legislature to pass what laws it sees fit in regard to irrigation districts untrammeled by the general requirement that laws of a general nature shall have a uniform operation. We cannot agree with this. There is nothing to indicate that the power granted the legislature by this provision was not to be exercised by it subject to the general requirements of the constitution governing the manner in which the power of legislation when conferred or possessed shall be exercised. *The legislature has the power as conferred by the provision of the constitution just quoted to legislate concerning the affairs of irrigation districts, but that power, like the power of the legislature to legislate on other subjects, must be exercised in the manner in which the constitution provides that the power of legislation when it exists must be exercised. Before any grant of power to legislate on a particular subject can be held to be free of a general requirement governing all legislation, the intent of the constitution to that effect must be plain. No such intent appears in the present instance.*" (183 Cal. at pp. 441-442; italics added.)

By the same token, we are here confronted with a situation in which the Legislature has been granted the power to provide for the financing of schools through the mechanism of county levies of school district taxes. Nothing in the constitutional provision establishing that power, however, indicates that its exercise is to be freed from general constitutional limitations applicable to all legislation. Accordingly the Legislature, in its exercise of the subject power in conjunction with other powers possessed by it, was obliged to act in a manner consistent with such limitations. This it has not done. Instead it has undertaken to create a school financing system which, by making the quality of educational opportunity available to a student dependent upon the wealth of the district in which he lives, is manifestly inconsistent with fundamental

constitutional provisions guaranteeing the equal protection of the laws to all citizens of this state. That system, we hold today, can no longer endure.

We also reject as wholly without merit the contention that the school financing system before us is somehow made necessary or permitted by the provisions of article IX, section 1, of the state Constitution. That section provides: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." We declare ourselves at a loss to understand how this provision can be said to mandate or authorize the creation of a system which conditions educational opportunity on the taxable wealth of the district in which the student attends school.

For the foregoing reasons we cannot accept defendants' argument that there exists some irreconcilable conflict between the requirements of our state equal protection provisions and other state constitutional provisions of equal stature—namely article XIII, section 21, and article IX, section 1. The latter provisions, as we interpret them, neither mandate nor approve a system such as that before us, and therefore the only conflict which here appears is that between the requirements of our state equal protection provisions and the proven realities of the present, legislatively created California public school financing system—a conflict which the trial court, by holding that system to be invalid, properly resolved.[54]

## IX

To recapitulate, we conclude that the trial court properly ordered and decreed that the California public school financing system

[54]We decline defendants' invitation to address ourselves to the constitutional merits of the various financing alternatives and combinations thereof which have been developed in the scholarly literature on this subject. Our concern today is with the system presently before us. We are confident that the Legislature, aided by what we have said today and the body of scholarship which has grown up about this subject, will be able to devise a public school financing system which achieves constitutional conformity from the standpoint of educational opportunity through an equitable structure of taxation.

As the dissenting opinion observes, quoting from the *Rodriguez* decision, "the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them." In this we most heartily agree; we differ with our brethren only as to the constitutional framework in which that task must be undertaken.

for public elementary and secondary schools, including those provisions of the S.B. 90 and A.B. 1267 legislation pertaining to this system, while not in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution, is invalid as being in violation of former article I, sections 11 and 21 (now art. IV, § 16 and art. I, § 7, respectively) of the California Constitution, commonly known as the equal protection of the laws provisions of our state Constitution. This determination and the other related provisions of the judgment we find to be fully supported by the findings and the evidence; indeed, no attack has been made on the findings as lacking evidentiary support. For the reasons we have detailed, we discern no jurisdictional defect in the proceedings below based on the claim—rejected by us as devoid of merit—that the Governor and the Legislature should have been joined as indispensable parties. We conclude that the holding of the trial court is grounded solidly and soundly on our earlier decision in *Serrano I* wherein we determined among other things that the California public school financing system, failing to withstand "strict scrutiny," denied plaintiffs the equal protection of the laws under the relevant provisions of our state Constitution. We therefore confirm that our decision in *Serrano I* was based not only on the equal protection provisions of the federal Constitution but also on such provisions of our state Constitution, and we emphasize that insofar as the latter provisions are applicable here, *Serrano I* constitutes the law of the case.

We observe that the trial court so deemed it and properly adhered to the law set forth in our earlier opinion in assessing for state constitutional purposes the same financing system as revised by S.B. 90 and A.B. 1267. ■ Since such system before the court was shown on substantial evidence to involve a suspect classification (based on district wealth) and to touch upon the fundamental interest of education, the trial court properly followed *Serrano I* in subjecting it to the "strict scrutiny" test under which the state has the burden of establishing that the classification in question is necessary to achieve a compelling state interest. ■ Applying this test, the court properly determined on findings supported by substantial evidence that the state had failed to bear its burden and that the financing system before it was invalid as denying equal protection of the laws as guaranteed by the California Constitution. ■ Finally we hold that, contrary to defendants' claim, there is no conflict between the requirements of our state equal protection

provisions and other provisions of the California Constitution so as to compel the former to yield as the determinative law of this case.

The judgment is affirmed. We reserve jurisdiction for the purpose of considering and passing upon respondent's motion for an award of attorneys' fees on appeal, filed January 28, 1977.

Wright, C. J., Tobriner, J., and Mosk, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. My disagreement with the majority focuses principally on part VIII of their opinion wherein they consider the application of article XIII of the California Constitution to the present school financing program, concluding that the system is invalid as violative of the equal protection provisions of that Constitution. As I develop more fully below, I have serious reservations about the constitutional analysis indulged by the majority as it affects article XIII. My principal problem with the majority's thesis is *that the same Constitution expressly authorizes the essential elements of the challenged system.*

The majority's learned and comprehensive review of the asserted faults and failings of the present scheme and their holding that another, more equitable, one must be devised to replace it, may well be consistent with sound public policy. Doubtless, it represents a well-intended effort to assure equal educational opportunity for California's school children. Nonetheless, it is not our function to formulate public policy. Under our time-honored, constitutionally founded system of separation of governmental powers, we are not entrusted with such difficult tasks as devising or choosing between alternative educational financing policies. That responsibility is vested in the Legislature, alone, acting within the confines expressed in our state Constitution. So long as the Legislature has performed its work in a manner consistent with overriding constitutional principles, we must uphold its efforts regardless of our personal views as to the fairness or wisdom of those legislative results. Accordingly, it becomes vital to analyze with great precision those constitutional limits on legislative action before we invalidate a system as important and accepted as the existing California school financing plan.

The majority do not now rely upon the equal protection clause of the *federal* Constitution. Contrary to our holding in *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*), it is now established by the highest authority that school district financing systems such as ours do *not* offend federal equal protection principles. (*San

*Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278].) Indeed, the majority herein candidly admit that the *Rodriguez* decision clearly "undercuts" *Serrano I*'s reliance upon the national charter. (*Ante,* p. 762.) Among other things, the high court in *Rodriguez* held that the "strict scrutiny" standard of review was inapplicable, since no "fundamental interest" or "suspect classification" was involved; that the present traditional method of local district financing, though perhaps unfair in some respects, nevertheless operates in a rational fashion, without invidious discrimination; and that the courts should defer to the state *legislatures* in these matters of policy, since these bodies alone have the necessary expertise and familiarity with local problems. One may differ, as I do, with the high court's conclusion that education is not a fundamental interest. Yet, the question of whether the school financing plan here at issue violates *federal* equal protection has been laid to rest in *Rodriguez.*

The majority herein, disagreeing with *Rodriguez'* analysis of the equal protection issue, point to the fact that *Serrano I,* in a footnote, stated that its analysis of plaintiffs' federal equal protection contention "is also applicable to their claim under . . . state constitutional provisions." (5 Cal.3d at p. 596, fn. 11.) The majority then hold, as we have noted, that California's school financing system is invalid under the only remaining constitutional refuge—the *state* equal protection provisions. (Cal. Const., art. I, § 7, art. IV, § 16.)

In broad, general language the Constitution guarantees both equal protection of the laws and uniform operation of the laws, and forbids irrevocable special privileges or immunities. Since, as we have previously observed, these provisions are "substantially the equivalent" of the federal equal protection clause (*Serrano I,* 5 Cal.3d at p. 596, fn. 11), although not required to do so, we might defer to the *Rodriguez* equal protection analysis rather than create our own different interpretation of substantially identical constitutional language. (See *People* v. *Disbrow* (1976) 16 Cal.3d 101, 119, dis. opn. [127 Cal.Rptr. 360, 545 P.2d 272].) Indeed, a number of state courts in post-*Rodriguez* cases have done just that—namely, declined to invalidate comparable school financing systems in reliance upon state constitutional provisions. (See *Northshore School District No. 417* v. *Kinnear* (1974) 84 Wn.2d 685 [530 P.2d 178, 200-202]; *Shofstall* v. *Hollins* (1973) 110 Ariz. 88 [515 P.2d 590]; *Thompson* v. *Engelking* (1975) 96 Idaho 793 [537 P.2d 635]; cf. *Hootch* v. *Alaska State-Operated School System* (Alaska 1975) 536 P.2d 793, 804;

but see *Robinson* v. *Cahill* (1973) 62 N.J. 473 [303 A.2d 273].) The present majority are, for reasons which I fully respect but do not accept, unwilling to follow the lead of *Rodriguez* and the foregoing cited cases.

My dissent, however, does not rely upon the foregoing principle of deference, for in my view the majority's analysis contains a serious, indeed fatal, flaw: the same California Constitution which *generally* extends equal protection also *specifically* authorizes the essential elements of California's present system of school financing. As a matter of interpretive principle, the authority which the Constitution specifically extends with one hand cannot be generally withdrawn with the other.

The majority thoroughly explain that our public schools are financed from two major sources, the state school fund and local district taxes. As to the *former, state* aid to education is authorized by article IX, section 6, of the state Constitution, which directs the Legislature to provide a state school fund for apportionment each year in an amount not less than $180 per pupil in average daily attendance; that the fund shall be apportioned annually as the Legislature may provide, through the school districts; and that the Legislature must apportion at least $120 per pupil in the district during the next preceding fiscal year, and at least $2,400 to each school district in each fiscal year.

As to the *latter,* assistance to schools from *local* district taxation, the subject of plaintiffs' challenge herein, is authorized by article XIII, section 21, of the Constitution which provides: "Within such limits as may be provided under Section 20 of this Article [allowing the Legislature to provide maximum local property tax rates and bonding limits], the Legislature shall provide for an annual levy by county governing bodies of school district taxes sufficient to provide annual revenues for each district that the district's board determines are required for its schools and district functions."

Paraphrased, section 21 requires the Legislature to adopt a school financing system in which each county may levy annually a school district tax in an amount sufficient to provide the revenues deemed necessary by each district board. Since under our Constitution property must be assessed in, and taxed only by, the county, city and district in which it is situated (art. XIII, § 14; see *San Francisco etc. Ry. Co.* v. *Scott* (1904) 142 Cal. 222, 229 [75 P. 575]; *Smith-Rice Heavy Lifts, Inc.* v. *County of Los Angeles* (1967) 256 Cal.App.2d 190, 200 [63 Cal.Rptr. 841];

Ehrman & Flavin, Taxing Cal. Property (1967) § 162, at pp. 145-146), it necessarily follows that article XIII of the Constitution, section 21 in conjunction with section 14, contemplates a school financing system in which each individual district's needs are satisfied from the taxable wealth of that district, namely, the present system which the majority find unconstitutional. The majority describe the foregoing reasoning as a "non sequitur." If, however, section 21 empowers the Legislature to provide for district tax levies to assure adequate school revenues, and if under section 14 the property subject to tax by the district to generate those revenues must repose within the district, wherein lies the "non sequitur"? Do not sections 14 and 21, in combination, authorize, *constitutionally,* a system whereby levy of taxes on local property within the district, supplemented by state aid, shall constitute the source of school financing?

The majority assert that the constitutional provision at issue was intended to authorize a different, more equitable, system not based upon disparities in district wealth. They concede that the state Constitution "allows variation in school district *expenditures*" (*ante,* p. 770, italics added). One would presume that *expenditures* are more closely related to the quality of education than generalized equality in the value of properties subject to district school taxes. However, we emphasized in *Serrano I* that the state Constitution did *not* require an equality of spending between various school districts. Our words were ". . . we have never interpreted the constitutional provision to require equal school spending; . . ." (5 Cal.3d at p. 596.) Nonetheless, the majority insist that since the Constitution does not expressly authorize district wealth disparities as to the source of district revenues, the present system cannot be deemed protected by its shield. In the majority's view, "Such disparities . . . are the result of *legislative action, not constitutional mandate.*" (*Ante,* p. 772, italics in original.) (In this connection, I do not contend, of course, that the California Constitution *mandates* the present system of school financing, but only that it *permits* or *authorizes* that system.)

The central theme of the majority is that the Legislature has somehow abused its constitutional authority by drawing school district boundary lines in a manner permitting variations in district wealth. As the majority put it, "It is that action [drawing district boundary lines], which we reiterate is the product of *legislative* determinations, that we today hold to be in violation of our state provisions guaranteeing equal protection of

the laws." (*Ante,* p. 772, italics in original.) Yet, again it is manifest that the Legislature derives its power to create and classify school districts *from the same Constitution* (art. IX, § 14). Furthermore, we ourselves have long held that "The power of the legislature over school districts is *plenary.* [Citations.] It may divide, change, or abolish such districts at pleasure . . . . [Citation.]" (*Worthington S. Dist.* v. *Eureka S. Dist.* (1916) 173 Cal. 154, 156 [159 P. 437], italics added; see *Hughes* v. *Ewing* (1892) 93 Cal. 414, 417 [28 P. 1067].) It seems to me self-evident that if the framers of our Constitution had intended to impose substantial restrictions upon the *plenary* power of the Legislature over school district boundaries, they would have *expressly* so provided. They did not do so. I suggest that it is highly unlikely that such a drastic and dramatic restriction on plenary power as the majority now impose would have been intended to occur *wholly by implication.* With due deference, I suggest that, to the contrary, we must presume that those who adopted section 21 (and its predecessor sections) were fully aware of the fact that there existed for years disparities in district wealth and that the effect of the continued exercise of such plenary legislative power would result in continued disparities, which permitted wealthier districts to allocate more funds for educational purposes. (Undoubtedly, the existence of such disparities was a motivating factor in creating the state school fund to supplement local revenues. (Art. IX, § 6.)) The inequitable result of district wealth disparities is forcefully and eloquently demonstrated by the majority. Nevertheless, once we determine that the action in question is constitutionally authorized, the sociologically unsatisfactory or, indeed unacceptable, consequences are matters for legislative correction.

We have often insisted that a constitutional enactment be viewed in the "light of its historical context and the conditions existing prior to its enactment." (*Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 534 [50 Cal.Rptr. 881, 413 P.2d 825], and cases cited.) Section 21 of article XIII, was adopted as recently as 1974. We have been told that its purpose was to restate "without change in meaning" the provisions of former article IX, section 6, adopted in 1946. (See Cal. Const. Revision Com., Proposed Revision of the Cal. Constitution (1971) pt. 6, p. 36.) Section 6 provided: "The Legislature shall provide for the levying annually by the governing body of each county, and city and county, of such school district taxes, . . . . as will produce in each fiscal year such revenue for each school district as the governing board thereof shall determine is required in such fiscal year for the support of all schools and functions of said district authorized or required by law."

Thus, as early as 1946, the California Constitution expressly authorized a system of local school district financing. Indeed, the original 1849 Constitution provided that any local school district which neglected to "keep and support" its school might lose its proportion of the interest from the public school fund. (Art. IX, § 3.) Local school district financing systems in various forms, but all of them based upon individual district wealth, have been in operation from this state's inception surviving numerous amendments to the constitutional provisions authorizing local support of public schools. (See Sweet, History of the Public School System in Cal. (1876) at pp. 60-62, 66.)

The foregoing review of constitutional history is not new. A close examination of our own previous analysis of the problem demonstrates that the same conclusions I have reached were also necessarily implicit in our opinion in *Serrano I*. Respectfully, I find unconvincing the majority's attempt to explain away our definitive disposition in *Serrano I* of the state constitutional issue whether district wealth disparities can survive equal protection analysis.

First, in describing the present school financing system, *Serrano I* acknowledged that wealth-produced variations in district spending are a necessary by-product of the system authorized by the state Constitution. We said: "Pursuant to *article IX, section 6* [the predecessor to art. XIII, § 21] of the California Constitution, the Legislature has authorized the governing body of each county, and city and county, to levy taxes on the real property within a school district at a rate necessary to meet the district's annual education budget. (Ed. Code, § 20701 et seq.) The amount of revenue which a district can raise in this manner *thus depends largely on its tax base—i.e., the assessed valuation of real property within its borders.*" (5 Cal.3d at p. 592, italics added.) The foregoing, contrary to the majority view (*ante,* p. 771, fn. 50), is founded upon *constitutional* (art. IX, § 6 (the predecessor to art. XIII, § 21)), *not legislative,* authority.

Second, in *Serrano I,* plaintiffs had argued that the present system was invalid under article IX, section 5, of the state Constitution, which section requires the Legislature to provide for a system of common schools. In rejecting the argument we said that, "While article IX, section 5 makes no reference to school financing, *section 6 of that same article* [the predecessor to art. XIII, § 21] *specifically authorizes the very element of the fiscal system of which plaintiffs complain.*" (5 Cal.3d at p. 596, italics

added.) What was the "element of the fiscal system of which plaintiffs complain"? The majority insist that this phrase related to "variations in expenditures per ADA." I think it arguable, however, that this "element" in question had broader implications and included not only expenditure inequalities but district wealth disparities as well. For, on the page previous to the above quotation, we had described plaintiffs' preliminary contention as follows: "Plaintiffs' argument is that the present financing method produces separate and distinct systems, *each offering an educational program which varies with the relative wealth of the district's residents.*" (*Id.,* at p. 595, italics added.) I think that it is this element which section 6 of article IX authorizes, and not merely the existence of "variations in expenditures per ADA" (as suggested by the majority herein).

Third, in *Serrano I,* we stated that "it is clear that such [locally raised] revenue is a part of the overall educational financing system. As we pointed out, *supra,* article IX, section 6, of the state Constitution specifically authorizes local districts to levy school taxes." (*Id.,* at p. 598, fn. 12.) Once again the question must be put: If under article IX local district taxes are specifically authorized for school support, and if, under article XIII, of that same Constitution, such taxes necessarily must be assessed upon local wealth, then how is the system rendered unconstitutional under article I?

Finally, in *Serrano I* defendants had argued that any discriminatory effects arising from the present system were "de facto" in origin and accordingly not invidious in nature. We flatly, and in my opinion wisely, rejected the argument, noting that "Indeed, we find the case unusual in the extent to which governmental action *is* [italics in orig.] the cause of the wealth classifications. *The school funding scheme is mandated in every detail by the California Constitution and statutes.*" (*Id.,* at p. 603, italics added.) The majority insist that the constitutional provision mandates "only that there be a system allowing for local decision as to the level of school expenditures," (*ante,* pp. 771-772). I fail, however, to see how such local decision making, necessarily based upon available local wealth as supplemented by state aid, differs in any material respect from the financing system under scrutiny herein.

In summary, we must reconcile two separate provisions of the state Constitution, first, a general expression guaranteeing our citizens "equal protection of the laws," and second, a specific constitutional provision

authorizing the Legislature to adopt a school financing system whereby each district finances its own educational needs. The majority, purporting to follow the well established rule that conflicts between constitutional or statutory provisions should be avoided, construe article XIII, section 21, I respectfully suggest, in a manner which contradicts its plain meaning, ignores the "historical context" of the section, and conflicts with our own recent construction of that section in *Serrano I.* The irreconcilable conflict arising from the majority's rejection of the *Rodriguez* analysis necessarily leads to a result which is not palatable to them—namely, in accordance with *Serrano I,* the conflict can be resolved in only one manner: *the more specific provision of the Constitution must prevail.* (5 Cal.3d at p. 596.) I am unable to accept the majority's conclusion that the present system of school financing in this state, whose essential elements are expressly authorized by specific provisions of the state Constitution, is at the same time in violation of the general equal protection clause of the same Constitution.

Few constitutional principles are more firmly established and accepted than the rule that all presumptions and intendments favor the validity of legislation. The case for invalidity of statutes must reach beyond mere doubt to the level at which we fairly can say that " ' ". . . their unconstitutionality clearly, positively, and unmistakeably [*sic*] appears." ' " (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204].) Similarly, it is equally well settled that there exists a strong presumption in favor of the Legislature's interpretation of a provision of the Constitution. (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161].) Thus, we must presume that the Legislature properly construed the scope of its authority under article XIII, section 21, of the Constitution, and we must further presume that the resulting school financing legislation is constitutional. The foregoing principles must be accorded great weight in determining the constitutional validity of the present school financing scheme.

I am wholly sympathetic toward the majority's efforts to achieve a more fair and equitable result in this case. I also fully acknowledge the vital role which education must play in our modern society, and the absolute necessity of assuring an adequate education for all of our citizens. There could be no more worthy goal. Yet, and I say this with the utmost deference, as I conceive our role we are not free to roam in search of administratively acceptable answers, but must work within the confines of constitutional limitations, leaving to the Legislature the selection of those particular responses which are most appropriate to a

developing need. (Cal. Const., art. III, § 3.) So long as the Legislature has operated under its constitutional authority we should withhold intervention. It is this principle, I believe, which prompted the wise and pertinent admonition of the United States Supreme Court in the closing sentences of its *Rodriguez* decision: "These matters merit the continued attention of the scholars who already have contributed much by their challenges. *But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.*" (*San Antonio School District* v. *Rodriguez, supra,* 411 U.S. at pp. 58-59 [36 L.Ed.2d at p. 58], italics added.)

I would reverse the judgment.

**CLARK, J.**—I dissent.

Our schools serve nearly 5 million students, spending over $5 billion. (1973-1974, Cal. Public Schs. Selected Stats., pp. 84-85, tables IV-1 B, IV-2 B.)[1] The educational system works amazingly well, considering its huge size, the complexity of its support, and the great diversity of geography, population and commerce within our state. The system provides a high and relatively uniform level of educational opportunity.

Approximately half our schools' budget of $5 billion comes from local real property tax. Eliminating this resource would be unfair to our youth, jeopardizing the quality of their education. It is questionable whether raising an additional $2½ billion through other taxes is politically feasible. The answer lies with the legislative and executive branches of state government. While neither urging abolition of local property tax nor invalidating article XIII, section 21, of our Constitution providing for local property taxes and local control of the spending level, the majority's requirement for absolute equality in the opportunity for school finances[2] will have this effect.

Our present system of school financing has three abilities or goals: (a) to provide a high level of equality in access to resources;[3] (b) to maintain

[1]The Selected Statistics is an official publication and all page and table references are to it unless otherwise indicated. The 1973-1974 school year is the first analyzed under Senate Bill No. 90 and Assembly Bill No. 1267.

[2]The majority state in a variety of ways that we may not allow the availability of educational opportunity to vary as a function of the assessed valuation per pupil. (E.g., *ante,* pp. 755-756, 768.)

[3]Equal educational opportunity is an important goal of government. However, the majority do not concern themselves directly with equal educational opportunity. Rather,

a high level of local control over the nature and amount of expenditure; and (c) to require a substantial level of fiscal responsibility. In a system where one branch of government finances in whole or in part another branch which is given control over the expenditure, the three goals are frequently in conflict. The majority's goal of absolute equitable opportunity for school financing means sacrificing either local control or fiscal responsibility. Our legislative and executive branches, no doubt based on their experience with numerous federal-state financing programs, have established a system in which the level of equal opportunity cannot be significantly increased without major sacrifice of local fiscal or administrative control.

The present system of school finance assures that every school district shall have access to certain funds per student at a fair local tax rate regardless of district wealth. The combination of the guaranteed amount and categorical aid not challenged in this action is equal to roughly 90 percent of the school budget in California—the equalized portion—leaving only about 10 percent which is affected by our current source of concern—district wealth. The potential 10 percent disparity in tax support among districts is small when viewed in light of the total educational commitment, and is fully justified by the traditional governmental interest in preserving local decision-making with local fiscal responsibility. The majority's attempt to abolish this small disparity, and

they are concerned with whether there is equal opportunity for school funding, a test at least one step removed from the basic goal.

Because there are such great variations in our state, there is little reason to believe that district opportunity to equal funding will produce equal educational opportunity. For instance, there is great variation in heating costs between our Sierra schools and our San Diego schools. Likewise, air conditioning is no doubt a major expense in Imperial Valley but will be relatively minor in coastside areas. School site costs in the center of San Francisco will be many times greater than the cost of an equal amount of land in Paso Robles. And, of course, the cost of living varies greatly throughout the state, indicating a need for salary differentials. There is no reason to assume that the numerous cost differentials faced by school districts offset each other and that somehow equal funding will result in equal educational opportunity.

More importantly, there is the additional question whether funding is directly related to educational opportunity or whether a more direct relationship exists between opportunity and other matters such as the ability and interests of one's classmates. Even with equal opportunity to funding, there will be disparate raising of funds because voters have vastly different ideas concerning facilities and priorities.

At trial expert testimony revealed there is no substantial correlation between the rich district-poor district assessed valuation on the one hand, and the level of student performance in statewide achievement tests on the other. Measured on a scale from one to ten, the correlation varied between positive two and negative one.

Nevertheless, for purposes of this opinion, the majority's thesis is assumed, that the equality which the courts should enforce is of funding rather than of educational opportunity.

in offering no substitute, will create greater inequality, frustrate local decision-making, or eliminate local fiscal responsibility.

This litigation has travelled through our courts for many years, having been before this court more than five years ago. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) If the absolute equality demanded by the majority (see, *ante,* fn. 2) can be achieved without sacrificing local fiscal responsibility or local control and taxation required by article XIII, section 21, the majority have a duty to tell us how. *They have not because they cannot.*

Secondly, by repeatedly referring to "poor" districts and "rich" districts within the 10 percent disparity, and by holding there must be absolute equalization among districts, the majority assume the popular role of Robin Hood, appearing to take from the rich to give to the poor. However, the question whether a governmental entity's assets should be adjusted is not the province of Robin Hood, of our state or federal Constitutions, or of this court. Rather, we must look beyond the governmental entity to the citizenry that government is designed to serve. When we do so, Robin Hood loses his disguise, and we find the Sheriff of Nottingham, taking from the poor to give to those more fortunate. Such reverse welfare is hardly compelled by the equal protection clause of any constitution.

## EQUALITY, LOCAL CONTROL, AND FISCAL RESPONSIBILITY

### A. *The Conflict in Goals*

The conflict in goals can best be illustrated by looking at the outlines of various methods of school financing and their effect on the three goals.

(1) The simplest method would appear to be total state financing of the district with the district given full control of the level of expenditure. Absolute equality of financial resources is assured because each district need only ask for funds and the state will comply. Local control is assured by definition. However, fiscal responsibility fails and the result is bankruptcy. A local district, being able to transfer all but insignificant costs to the state, will be unrestricted in spending for the benefit of its citizens on any school-related activity. Conceivably, every school district will have a performing arts center rivaling Los Angeles', resulting in insolvency.

(2) Of course total state financing might avoid bankruptcy by establishing spending limits, by apportioning the entire school expenditure on a per pupil basis, or by a combination of the two. While such system might meet the goals of equality in funding resources and fiscal responsibility, it eliminates local control of spending levels.[4]

(3) At the other end of the spectrum would be purely local financing. This system satisfies the requirement of fiscal responsibility—requiring the community that spends the money to tax itself for the full amount. However, the system would be less equitable than that reviewed in *Serrano I*.[5]

(4) While the majority do not specify which system should be adopted, "power equalizing" appears to be their choice because it appears to be the one the majority measure against the existing system in order to arrive at invalidity. The system " 'has as its essential ingredient the concept that school districts could choose to spend at different levels but for each level of expenditure chosen the tax effort would be the same for each school district choosing such level whether it be a high-wealth or a low-wealth district.' " (*Ante,* p. 747.)

The latter system is easily illustrated using hypothetical figures. If the tax rate is $2 it must produce the same amount of income per pupil in every district in the state, let us assume $800. If the tax rate in any district is $3, the district must receive the same amount per pupil, let us assume $1,200. These amounts must be received regardless of the wealth of the school district. Obviously, in poor districts, those with low assessed valuation per pupil, the tax will not produce sufficient revenue, and the state will have to provide the difference. In rich districts, the given tax rates will produce excessive revenue, with the state obtaining the excess.

To illustrate the impact of the system on the districts, let us look at the effect on three kinds of districts, one having assessed valuation producing

---

[4]For the above reasons, the first system of school support suggested by the trial court, full state funding (*ante,* p. 747), should be rejected. Moreover, total state funding would violate the requirements of partial local financing and control imposed by article XIII, section 21 of our Constitution.

[5]Theoretically, we could achieve all three goals by redrawing the district lines to have substantial equality of assessed value per student in every district. However, because the number of students and assessed valuations change each year, the boundary lines would have to be redrawn every year or two. A single, successful wildcat oil well might require a statewide redistricting with the consequent reassignment of students and teachers. Each large new subdivision would also require redistricting. Obviously, the system would involve huge waste and the second system suggested by the trial court (*ante,* p. 747) must be rejected.

the exact amount of money set forth above, the second having half that assessed valuation (a poor district), and the third having double the assessed valuation (a rich district). In the first district fiscal responsibility is assured because school board members, considering expenditures, will have to tax their constituency for all expenditures. In the second or poor district an element of fiscal irresponsibility is introduced. For there, every dollar the school board members decide to spend, only a half dollar need be raised from the constituency, the state paying the other half. The poor district is encouraged to raise its tax rate to obtain state funding for the community, purchasing educational opportunity at the half-price sale. Because the higher the tax rate, the more state money and the greater bargain, the poor district is encouraged to adopt a high tax rate, funding programs the first district would not undertake. This, of course, is the basic spending incentive involved in partial federal support for state programs.

The third or rich district, on the other hand, will be penalized for any expenditure. For every dollar it seeks to spend for its students it must raise $2 by tax, sending one to Sacramento. Faced with punishing their constituency for each expenditure, the school board members will restrain expenditure by eliminating programs the first and second districts would undertake.

Viewed from the standpoint of dollar cost to the district, rather than tax rate, illustration number 4 presents a mirror image of illustration number 3, not equalizing but presenting an inverse relationship between district wealth and opportunity to fund schools. The rich district will become poor by its disincentive to spend, and the poor will become rich by its substantial incentive to spend. The fact that at any given tax rate, expenditure may be equal in each district does not eliminate either the troublesome disincentive or the incentive. Both render the opportunity for school funding unequal. The opportunity varies with the assessed valuation per student within districts—inversely it is true—but by varying with district wealth, it necessarily violates the majority's basic requirement that no such variation be permitted.[6] (See, e.g., *ante,* p. 747.)

[6]The trial court also suggests that commercial and industrial property be removed from local school tax rolls, taxing such property at the state level. (*Ante,* pp. 755-756, 768.) Apparently, the suggestion is based on the trial court's finding that the principal cause of inequality in the assessed valuation per student is due to the presence in some districts of industrial and commercial property. However, this would still leave inequalities due to the great differences in residential property values and in the ratio of public school students to the total population of a district. There is no indication that the resulting

(5) The four school support systems illustrated above are the basic systems, given that financing depends upon property tax. Although other systems have been suggested (see, *ante,* fns. 5, 6), they involve either great waste of resources or lack assurance they will result in significantly greater equality than the existing system. However, before looking at the existing system, a few observations are warranted. Only the first two systems (total statewide financing) can produce the majority's requirement of absolute financial equality. The first, as we have seen, involves a substantial risk, if not a certainty, of insolvency. The second avoids bankruptcy but *totally* eliminates local control of expenditure levels. The third and fourth systems (local financing) necessarily involve a relationship between district wealth and the opportunity for educational funding, direct or inverse, in violation of the majority's rule prohibiting any such wealth relationship.

Further, to the extent the third and fourth systems are used significantly, some wealth relationship in the opportunity for educational funding will occur. This results because local school board members—properly concerned with their constituency—will always look to the local effect of their action. In a democracy we can expect no less. Considering expenditures on the fundamental issue of whether to hire more teachers, reducing class size, or to hire fewer teachers, increasing class size, local school board members must ask what burdens in dollars and tax rates are being placed on district residents. In other words, unless state funding covers substantially all costs, the marginal expenditure is going to be based on local funding considerations. Local financing systems three and four, as we have seen, necessarily involve wealth relationships—direct or inverse—and to any extent that they are used, school funding will be based on wealth relationships.

*The rational approach to the three conflicting goals of equality, fiscal responsibility and local control, requires rejecting the majority's demand for absolute equality and accepting a combined system to accommodate each. Minor departure from the ideal of absolute equality must be allowed in order to accommodate the two other compelling interests. The existing system does no more.*

---

inequalities would be less than under the present system. Baldwin Park and Beverly Hills, the two school districts used in *Serrano I* to illustrate great inequality, are both primarily residential districts.

A system of vouchers was also suggested (*id.*) but that system is closely related to family wealth.

I have delayed evaluating our existing school finance system because it must be viewed in the light of alternate systems. The present system is the legislative and executive response to this court's first *Serrano* decision within the confines of our Constitution's requirements of a mixed system of state and local financing and control. (Art. IX, § 6; art. XII, §§ 20, 21.) The system starts with system number 4, power equalizing, giving the poorer school districts an incentive to tax at the computational rate, $2.23 at the elementary level, and to receive the foundation level, $765 per student. An assessed valuation of $28,700 per student at a tax rate of $2.23 will produce $640 per student which when added to the $125 required to be paid for all students[7] will produce the $765 figure. A district having an assessed valuation below $28,700 will not receive the $765 per student from its local taxes and the $125 allowance, and the state will make up the balance. More than 85 percent of the students in this state are in districts having an assessed valuation of less than $28,700 per student. (Table III-8, p. 28.) These districts are called the equalization aid districts.

The principal criticism level against this part of the financial program is the limitation to $765, which means that for financing above that level the inequities of system 3 come into play. Why shouldn't the program of state aid extend on indefinitely to levels above $765? The answer should be apparent by now. The equalization factor produces inverse wealth relationships because the poor districts are encouraged to spend to bring state money to the community. Thus, some limitation must be placed on this type of financing, and as will appear, the $765 level is eminently reasonable.

The power equalizing approach is not carried forward to those districts having assessed valuation of more than $28,700 per student. (Nearly 15 percent of the students are in those districts.) The Legislature determined not to apply the penalizing factor discussed above. This means that a district having, for example, double the $28,700 per student assessed valuation could provide $765 per student at a tax rate of little over half the computational rate of $2.23. About 2½ percent of the elementary students are in school districts having double assessed valuation or more. (Table III-8, p. 28.)

---

[7] The $125 per student is not strictly speaking power equalizing. However, $120 of the $125 allotted on a per student basis is required by article IX, section 6, of our Constitution, the same Constitution imposing equal protection requirements involved here. To the extent this $120 produces inequality it is an exception to the equal protection requirement. It was improper for the trial court (*ante,* p. 744) to posit its determination of invalidity on this factor.

The principal criticism levelled against this factor of the system is that a few rich districts may have relatively low tax rates while still providing $765 per student. Although the factor gives rise to some inequality, the alternative of penalizing the rich district by giving part of its local funds to the state will impose new inequities in the opportunity for school funding—inequities much greater in practical effect than existing ones.[8]

The real question is how great is the inequality—not in abstract legal terms—but under the system as it really works. Our concern should not be that there may exist a district possessing $1 million assessed valuation per student, but possessing only 38 students. To use the example of this district and a few more like it to invalidate the statewide system is unfair, if not folly. Rather, to measure the existing system we must attempt to weigh inequality against the total system.

At trial, prior to the Senate Bill No. 90 and Assembly Bill No. 1267 results becoming available, attempt was made to quantify the inequalities arising under the new law in terms of total school fund revenues to be produced. The prediction was that 76 percent of the revenues would arise under the foundation program, the equalized revenues, 15 percent of the revenues would be categorical funds assumed to be equalized in this proceeding, and only 9 percent unequalized. Subsequently, records of the Los Angeles unified school districts, comprising 28 percent of the state's students, showed that only 10 percent of the budget constituted unequalized funds. In addition, the basic statewide figure showing an average current expenditure per elementary student of $985.48 (table IV-1A, p. 84) when compared with the $765 equalization aid figure, roughly indicates the correctness of the testimony.[9]

By setting the equalization aid figure at such a high number, resulting in aid to more than 85 percent of our students, the present system insures a high degree of equality. Ninety percent of the funding is distributed on an equitable basis with only 10 percent distributed inequitably. Further, even as to the 10 percent, poor school districts may and do obtain part by merely raising their tax rate above $2.23.

[8]In addition, the existing system places spending limitations on the rich district. The trial court and the majority discuss at length whether the limitations are real or illusory. The spending limitation is a further equalizing factor if anything, and because I believe the basic factors do not deny equal protection, it is unnecessary to discuss the spending limitations and their exceptions.

[9]When the approximately 15 percent of categorical aid is eliminated from the average of $985.48, the average payment becomes $837.67 which should be compared with the $765 equalization aid figure to roughly measure the inequality of opportunity.

As we have seen, attempting to eliminate all inequality—the majority's perfection requirement—will result in insolvency, loss of local control, or in new and greater inequity. Substantial reduction in the 10 percent revenue inequality similarly appears to involve substantial risks of insolvency, loss of local control, or the new inequity.

The majority attack the 90-10 ratio on three levels. First, they say it does not meet the requirement of absolute equality. (*Ante,* p. 755.) However, as pointed out above, the requirement should not be imposed. Second, the majority state that the 90-10 ratio, based on the 1973-1974 year, does not take into account inflation and declining future enrollment. (*Ante,* pp. 755-756.) However, the Legislature has provided for increases in foundational programs based in part on increases in assessed valuation, an indicator of inflation. (Ed. Code, § 17669.) The declining enrollment argument is that aid will decrease under the foundation program because there will be fewer students but that costs will decrease at a slower rate. But by looking at an historical cost relationship, the majority depart from their own equality test, introducing a new one. Third, the majority state that the ratio of 90 percent equalized to 10 percent unequalized is false, urging that foundation funds are unequalized. (*Ante,* p. 757.) But the basic purpose of equalization aid has been to offset inequities in the foundation. Although the punishment factor has been omitted, it would apply only to districts having less than 15 percent of all our students, and would significantly apply to a much smaller percentage. For this reason any adjustment in quantifying the inequalities would be minimal.

### Rich and Poor

The impact of today's decision will require transferring school funding resources from the rich districts to the poor districts—there being little effect on the many districts which are neither rich nor poor. In our urban-suburban complexes where most students live, a rich district does not mean a district of rich people but is ordinarily one of poor residents, while a poor district is ordinarily one of more fortunate people. The impact of today's opinion appears to be a transfer of resources from poor people to those more fortunate.

The determination whether a district is rich or poor depends upon its assessed valuation per student. Thus, the presence of large tracts of property not occupied by children attending local public schools tends to

make a district rich. Absence of such property tends to make a district poor. Bearing this in mind, we can in general identify the so-called rich and poor districts.

Rich districts will include extensive commercial or industrial property or both, while the poorer ones will possess little of such property, either having zoned it out or having not attracted it. Rich districts will possess a low ratio of public school students to the total population—poor ones a high ratio.

With these considerations, we can further identify the rich and poor districts. Although exceptions exist,[10] rich districts comprise the older commercial-industrial areas. Because of the transition of relatively affluent families to the suburbs to raise families, the parents in rich districts tend to be poorer than the average.[11] The poor districts on the other hand are those having substantial new housing subdivisions but lacking commercial-industrial bases. They have a high ratio of students to total population. Parents who can afford to purchase new homes to raise their families are ordinarily more affluent than those residing in the older commercial-industrial areas.

This analysis of poor and rich districts is confirmed by numerous studies (see Zelinsky, *Educational Equalization and Suburban Sprawl: Subsidizing The Suburbs Through School Finance Reform* (1976) 71 Nw.U.L.Rev. 161, 162, 182-184, and authorities collected) and by my study of the poor and rich districts in the 1973-1974 school year. (Table IV-11, pp. 93-123.) Further, the trial record discloses a number of illustrations where the mature industrial-commercial community has a much higher assessed valuation per pupil than the nearby new suburban area (in some cases more than double). But the latter has a much higher per capita income than the former (again sometimes a two-to-one relationship).

The rich districts being primarily poor people districts, and the poor ones composed of people more fortunate economically, I cannot believe

[10]The exceptions are the mature, very wealthy residential areas of Beverly Hills and Hillsborough, and the second home vacation areas of Lake Tahoe and Palm Springs.

[11]San Francisco Unified School District is one of the richest in the state. Besides its large amount of commercial and industrial property, the ratio of school children to general population is smaller than the statewide average, and the percentage of students attending private schools is higher than the statewide average. Per capita income is lower than the statewide average and the surrounding counties.

that equal protection requires us to take from the poor to give to the more fortunate.

## CONCLUSION

I conclude that we cannot have absolute equality of opportunity in school funding—and perhaps not in any other sector of governmental activity. The absolute equality demanded by today's majority opinion is particularly unobtainable if fiscal responsibility and local control—both compelling interests—shall be preserved. While California's present system for school financing may be less than perfect and although it departs from total equality, the minor departure is justified and the system should be upheld. Furthermore, invalidation takes from the poor and gives to those more fortunate—hardly the goal of equal protection.

I would reverse the judgment.

McComb, J., concurred.

Appellants' petition for a rehearing was denied January 27, 1977. Clark, J., and Richardson, J., were of the opinion that the petition should be granted. On February 1, 1977, the judgment was modified to read as printed above.